In The Matter of The Parental Rights as To CORTNEY ANNE WEINPER, CORY ARVIN WEINPER, Appellant, v. THE NEVADA STATE DEPARTMENT OF HUMAN RESOURCES, DIVISION OF FAMILY SERVICES, Respondent.

No. 27047

May 30, 1996                                   918 P.2d 325

*Jennifer L. Henry,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, *Linda C. Anderson,* Deputy Attorney General, Carson City, for Respondent.

**OPINION**

By the Court, Rose, J.:

On April 3, 1992, Cortney Anne Weinper (Cortney) was removed from the home of her paternal grandmother and her father, Cory Arvin Weinper (Weinper). Cortney was seven months old at the time. Cortney was removed because of Weinper's admitted drug use and allegations that Weinper had physically abused the grandmother. A case plan was adopted for reunification that required Weinper: (1) to submit to random drug testing; (2) to obtain substance abuse counseling; (3) to complete individual counseling with a Division of Child and Family Services (DCFS) approved agency; (4) to pay child support; (5) to obtain and maintain legal employment for a period of six months; (6) to obtain suitable and independent housing for a period of six months; and (7) to exercise visitation with Cortney.

The first review of Weinper's progress under the plan was conducted on November 4, 1992. Weinper did not appear at the hearing, but the report stated that he had made no progress. Additionally, no child support had been paid. The hearing master recommended that DCFS file a petition to terminate Weinper's parental rights by April 1993, unless Weinper made substantial effort toward compliance with the plan.

In January 1993, Weinper was sentenced to three years probation on drug charges, and his release from the Clark County Jail was conditioned upon his enrollment in a drug program. He enrolled in and completed a program at the Nevada Treatment Center, thereby satisfying not only a condition of his probation, but also one of the conditions of his case plan for reunification with Cortney. After his release from the treatment program, Weinper went to work for a telemarketing firm. It is unclear from

the record how long Weinper worked for the telemarketing firm, but when asked how long he worked there, Weinper replied, "I really can't recall, it seemed pretty steady, probably at least six months steady, if not a year." Although Weinper was visiting Cortney about once a month, he was still not paying child support. The only support that was received was $156.00 which was the result of a wage garnishment action initiated while Weinper was briefly working at Ace Cab Company.

Weinper was arrested in July 1993 and again in September 1993 for being under the influence of a controlled substance. During this time, Weinper was apparently attending the Nevada Treatment Center on an outpatient basis, but was discharged on December 7, 1993. Weinper tested positive for drugs in December 1993, and twice in February 1994.

The matter was reviewed again on May 31, 1994. Weinper was warned that if he did not fully comply with the case plan, termination of his parental rights would be considered.

On September 21, 1994, the Nevada Attorney General, acting through DCFS, filed a petition to terminate parental rights, on the grounds of neglect, unfitness, and Weinper's failure to remedy substantially the conditions that led to Cortney's removal. A hearing on the termination was held on November 10, 1994. Weinper appeared late and requested that counsel be appointed. The court appointed an attorney, and the matter was continued.

The next normally-scheduled review of the case plan occurred on November 22, 1994. DCFS filed the same report that it had previously filed in May, except that the date had been altered. The court noticed that the report had not actually been updated, and refused to consider the report as part of the review hearing.

The termination trial was held on February 10, 1995. At the time of the trial, Weinper was being held on charges of assaulting his mother, Mary, with a deadly weapon. A probation revocation hearing had also been scheduled.

At the termination trial, Weinper testified, *inter alia,* that he was familiar with the case plan for reunification. On March 2, 1995, the district court entered an order terminating Weinper's parental rights.

Weinper appeals, arguing that: (1) his right to procedural due process was violated; (2) jurisdictional grounds were not established by clear and convincing evidence; and (3) dispositional grounds were not established by clear and convincing evidence. We hold that although DCFS' performance in this case was slipshod, Weinper received due process and that jurisdictional and dispositional grounds were adequately established.

Weinper first argues that his right to procedural due process,

pursuant to the Fourteenth Amendment to the United States Constitution, was violated by the actions of DCFS and the district court. Specifically, Weinper alleges that the district court erred by terminating his parental rights without having a current review of the case plan prepared by DCFS.

The relationship between parent and child has long been recognized as a fundamental liberty interest. *See, e.g.,* Santosky v. Kramer, 455 U.S. 745 (1982); Stanley v. Illinois, 405 U.S. 645 (1971); Meyer v. Nebraska, 262 U.S. 390 (1923). The United States Constitution states that no State shall deprive any person "of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. This court has not specifically addressed the question of what constitutes due process in an action to terminate parental rights. Other states, however, have considered the question. *See, e.g.,* In Interest of Brehm, 594 P.2d 269 (Kan. 1979) (due process requires that a parent be represented by counsel in a termination proceeding); Matter of T.M.H., 613 P.2d 468 (Okla. 1980) (due process requires that parents be adequately apprised of the conditions that resulted in the removal of the child, so that the parents know which conditions need to be altered); State v. Darnell, 619 P.2d 1321 (Or. 1980) (allegations of the petition must be reasonably clear and definite); In re Clark, 611 P.2d 1343 (Wash. 1980) (parent must receive notice, an opportunity to be heard or defend, and assistance of counsel). In sum, other states have determined that, as a matter of due process, parents are entitled to: (1) a clear and definite statement of the allegations of the petition; (2) notice of the hearing and the opportunity to be heard or defend; and (3) the right to counsel.

In the instant case, Weinper was afforded all of the above rights. He received a clear and definite statement of the allegations, admitting at trial that he was familiar with the case plan and the conditions for reunification. He was present at the termination hearing, and he had the benefit of appointed counsel. The fact that the caseworker submitted a duplicate report prior to the termination hearing did not violate Weinper's right to due process. A current report from the caseworker is not a requirement of due process, especially where, as here, the parent is in court and able to inform the court of any change in circumstances occurring since the last report.

In this case, especially, the absence of a current case report did not work an injustice. Weinper had ample opportunity at the hearing to apprise the court of any progress he had made toward the case plan, and he was unable to show any progress. Weinper complains that the old reports did not reflect the fact that he had worked sporadically, that he had suffered an injury on the job, or

that he had served seven weeks on a federal jury. However, at the time of the hearing, Weinper informed the court of all these things. Despite the duplicate report, the court was fully informed as to Weinper's situation at the time of the hearing. We hold that Weinper's due process rights were not violated, despite the negligence of DCFS in this case.

Turning to Weinper's contention that DCFS failed to establish sufficient jurisdictional and dispositional grounds, we hold that the district court correctly found both. This court has previously interpreted NRS 128.105[1] as follows:

> [T]here are two kinds of grounds necessary to be considered in termination proceedings. One relates to parental conduct or incapacity and the parent's suitability as a parent; the other relates to the best interest of the child.
>
> Putting it another way: there must be *jurisdictional* grounds for termination—to be found in some specific fault or condition directly related to the parents—and *dispositional* grounds—to be found by a general evaluation of the child's best interest.

Champagne v. Welfare Division, 100 Nev. 640, 646-47, 691 P.2d 849, 854 (1984) (footnote omitted). Further, "[b]ecause of the sacredness of parental rights a higher standard of proof, that of 'at least clear and convincing evidence,' is required before the children can be judicially taken away." *Id.* at 648, 691 P.2d at 854 (citation omitted).

---

[1] NRS 128.105 provides:

**128.105 Grounds for terminating parental rights: Basic considerations.** An order of the court for termination of parental rights must be made in light of the considerations set forth in this section and NRS 128.106, 128.107, and 128.108, with the initial and primary consideration being whether the best interests of the child would be served by the termination, but requiring a finding that the conduct of the parent or parents demonstrated at least one of the following:

1. Abandonment of the child;
2. Neglect of the child;
3. Unfitness of the parent;
4. Failure of parental adjustment;
5. Risk of serious physical, mental or emotional injury to the child if he were returned to, or remains in, the home of his parent or parents;
6. Only token efforts by the parent or parents:
   (a) To support or communicate with the child;
   (b) To prevent neglect of the child;
   (c) To avoid being an unfit parent; or
   (d) To eliminate the risk of serious physical, mental, or emotional injury to the child; or
7. With respect to termination of the parental rights of one parent, the abandonment by that parent.

The district court found that jurisdictional grounds existed pursuant to: (1) NRS 128.105(3) (Weinper's unfitness as a parent) and (2) NRS 128.105(4) (Weinper's failure to adjust). Weinper argues that neither of these grounds was proven by clear and convincing evidence.

NRS 128.106 sets forth specific considerations in determining the unfitness of a parent. Among these is "[e]xcessive use of intoxicating liquors, controlled substances or dangerous drugs which renders the parent consistently unable to care for the child." NRS 128.106(4). The district court specifically found that Weinper was unfit as a parent because of his "drug use and criminal activity." There was clear and convincing evidence of both. Weinper tested positive for drugs three times during the three years preceding the termination hearing; the last time just seven months before the hearing. Additionally, Weinper had a misdemeanor drug conviction while on probation. As to the criminal activity, at the time Cortney was removed from the home, Weinper had been arrested for the theft of his mother's car and credit cards. At the time of the termination hearing, Weinper was incarcerated pending resolution of charges of assault with a deadly weapon. The alleged victim of the assault was Weinper's mother, with whom he had been living since Cortney's birth. There can be no question that there was clear and convincing evidence of Weinper's unfitness as a parent.

There was also clear and convincing evidence of Weinper's failure to adjust. NRS 128.109 provides that:

> If a child has been placed in the custody of the division of child and family services of the department of human resources and the parent or parents fail to comply substantially with the terms and conditions of a plan to reunite the family within 6 months after the date on which the child so [sic] placed or the plan commenced, whichever occurs later, that failure to comply is evidence of failure of parental adjustment.

Despite the fact that the statute allows a determination to be made of parental failure to adjust after only six months, DCFS tried to get Weinper to comply with the case plan for nearly three years before starting termination proceedings.

Weinper testified that he was familiar with the case plan, and yet he was unable to identify any area in which he had complied, or even made progress toward compliance, except that he had completed a drug treatment program. However, we note that he entered the program as a condition of his release from jail. It

appears to be coincidental that this condition was also included in his plan for reunification. We cannot help but wonder if he would have undertaken a drug treatment program had he not been forced to do so in order to be released from jail. Additionally, we note that he was unable to remain drug-free after his completion of the program. Certainly the point of completing a drug treatment program is to gain the skills necessary to begin living life without the aid of controlled substances. It is nearly pointless to complete the program and still not make any significant lifestyle changes. In sum, we find that there was clear and convincing evidence of Weinper's failure to adjust as a parent.

"The dispositional question is whether terminating parental rights would be in the best interest of the child. . . . The [dispositional question] focuses on the placement which will be most beneficial to the child." *Champagne,* 100 Nev. at 646, 691 P.2d at 854. Cortney is thriving in her foster home, where she has resided for the last two and a half years, since she was nine months old. This assertion was never challenged by Weinper. Additionally, as already discussed, there was ample evidence to support the district court's finding that Cortney's best interest would be served by terminating Weinper's parental rights because of Weinper's continuing unfitness as a parent and his inability and unwillingness to care for Cortney. Cortney would then be free to be adopted by the foster family; the only family she has known for most of her life.

This case is troubling, primarily for two reasons. It is very unfortunate that DCFS chose to act negligently and irresponsibly by failing to submit an updated report at the final review before the termination hearing. Its behavior, however, does not change the fact that there are clear jurisdictional and dispositional grounds for terminating Weinper's parental rights. It is also troubling that we have before us a parent who was repeatedly told that if he failed to comply with the case plan and assume the responsibilities of parenthood, his parental rights were subject to termination. In the three years that DCFS was trying to reunify Weinper and Cortney, Weinper was unable or unwilling to make the changes necessary to allow reunification. In the meantime, Cortney's life has been in limbo. She is fortunate to have had a beneficial foster placement which can now be made permanent. It would be a grave injustice to force Cortney to remain in limbo indefinitely until such a time as her father decides that he is ready to give up drugs and criminal activity. Accordingly, the order of the district court terminating Weinper's parental rights is affirmed.

STEFFEN, C. J., and YOUNG and SHEARING, JJ., concur.

SPRINGER, J., dissenting:

This is yet another in the spate of recent cases in which an ever-increasing number of natural parents are losing their children to the State because they are flunking their "reunification test."

The Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 620-628, 670-679 imposes upon the states a duty, when the state removes children from their homes, to use "reasonable efforts" to "make it possible for the child to return to his home." The Act requires that a "case review system" be set up by the states. In response to the federal legislation, the state has set up standards and regulations which require "continued assessment" of any child placement and the "development, revision and implementation" of a "written case plan." ("Substitute Care Manual," issued by Nevada State Welfare Division). The referred-to, written case plan is part of the federally mandated requirement that states use reasonable efforts to return to their homes children who have been removed from their homes by welfare officials. The case plan is sometimes referred to as a "reunification plan."

The mentioned Substitute Care Manual emphasizes that periodic evaluation is an "integral part of the casework process" and provides that the purpose of periodic evaluation of case plans is "to measure the extent to which treatment goals have been or are being realized." In other words, the primary duty of Welfare in cases where children have been removed from their homes is to *monitor* parental progress or lack of it with respect to the case plan.

When Mr. Weipner's child was removed from his home, Welfare set about the formulation of a reunification plan and arranged for periodic court reviews of the "reasonable efforts" that they were supposedly engaging in so that the child might be returned to its father. When this matter came before the district court for review on November 22, 1994, the court made a startling discovery. The case manager presented to the court the identical report that had been presented at the previous, May, 1994 hearing, only the date had been changed. The case manager's failure to file a proper and current report is not just an example of official laziness and neglect, it goes to the basic rights of this father, who was being denied the right to earn the return of his child by his compliance with the reunification plan. The trial court had given this father an "ultimatum" in May and told him that if he did not "shape up" (to use the vernacular), he was in danger of losing his child permanently. In response to the judge's ultimatum, the father did a number of things to improve his chances of having his child returned, including attempts to get work; but he suffered

set-backs in his employment by reason of injuries and his having served seven weeks on a federal jury.

The trial court decried the fact that the case manager had "chose[n] to submit an exact duplicate of a prior report rather than inform the court of the events during the review period." This, concluded the court, made it "impossible to review the efforts of the parents or of the DCFS when this is done. It is particularly regrettable when the Court has stated an ultimatum to a parent to comply."

The district court further observed that this was the second time that this particular case worker had tried to hoodwink the court. The court commented that these proceedings were not "meant to be a sham" and that case workers have the duty to act "responsibly" when submitting these kinds of reports. Said the court:

> This conduct cannot be tolerated, will not be tolerated, and as far as I'm concerned that conduct puts my decision today in substantial jeopardy . . . that conduct creates a difficulty that cannot be overcome.

In my judgment the proceedings leading up to this termination decree were, as recognized by the court a "sham"; and I agree with the trial court that it is "impossible to review the efforts of the parents" or the welfare agents when welfare agents are guilty of this kind of misconduct. The trial judge was, of course, correct, when he recognized that his decision was put in "substantial jeopardy" by the mentioned misconduct and that it "create[d] a difficulty that cannot be overcome."

Here we have a father who was trying. Here we have a father who does not deserve to lose his child. Given the gross misconduct of the Welfare agents in this case, I would remand the matter back to the trial court and order that the trial court provide the father with another six month's trial period, after which his efforts would be reviewed and a decision made, based upon a non-fraudulent welfare report, as to whether he is a fit parent and as to whether he "deserves"[1] to lose his child.

---

[1] "[A] parent does not deserve to forfeit the sacred liberty right of parenthood unless such unfitness is shown to be severe and persistent and such as to render the parent *unsuitable* to maintain the parental relationship." Champagne v. Welfare Division, 100 Nev. 640, 648, 691 P.2d 849, 855 (1984) (footnote omitted).