In the Matter of Parental Rights as to
MICHAEL WILLIAM BOW

ADRINA FRANCIS DECESPEDES RECODO, Appellant,
*v.* THE STATE OF NEVADA, DEPARTMENT OF
HUMAN RESOURCES, DIVISION OF CHILD AND
FAMILY SERVICES, Respondent.

No. 27315

January 4, 1997            930 P.2d 1128

*Potter Law Office* and *Michael Vaclav Stuhff*, Las Vegas, for Appellant.

*Frankie Sue Del Papa*, Attorney General, and *Linda C. Anderson*, Deputy Attorney General, Carson City, for Respondent.

## OPINION

By the Court, Rose, J.:

On May 31, 1995, the district court terminated the parental rights of appellant Adrina Francis Decespedes Recodo (Recodo) after concluding that Recodo was an unfit parent and had failed to adjust to become a suitable parent within a reasonable period of time. Recodo challenges the district court's conclusion, arguing that no clear and convincing evidence existed to support such a

conclusion. Recodo also argues that her due process rights were violated because she was not appointed counsel at all stages of the termination proceedings.

We conclude that clear and convincing evidence existed to support the district judge's conclusion and that Recodo's due process rights were not violated.

## FACTS

Michael William Bow (Michael) was born to Recodo on February 21, 1992.[1] Recodo is an American Indian enrolled with the Goshute/Shoshone tribe who at the time of the termination hearing was twenty-six years old. Until she was approximately three years old, Recodo lived on a reservation in Arizona, and in 1981, Recodo moved with her grandparents, her guardians, to rural Southern Nevada. In addition to Michael, Recodo has four other children. At the time of the termination proceeding, Michael was living in a prospective adoptive foster home. Three of her other children, Maria, Victor, and Fernando, were in the custody of Victor and Fernando's father, Recodo's ex-husband Fernando Decespedes. Recodo's marriage to Decespedes ended because he beat her. Her daughter Lupita was living with her at her grandmother's house.

Michael came to the attention of Debra McEwan, the social worker for the Moapa Band of Paiutes. According to McEwan, on approximately April 1, 1993, Recodo voluntarily placed Michael in foster care due to her financial inability to meet his needs. At the time of the placement, Recodo was living with her grandmother who could not adequately care for Michael due to her health and age and Michael's special medical needs at birth. As a result, McEwan agreed to place Michael in courtesy foster care for a short period of time so that Recodo could obtain her GED at the Indian Center and look for employment in Las Vegas on weekdays and still care for Michael on the weekends. This arrangement was scheduled to last for six months. Recodo testified that during this period, she drove her grandfather's car into Las Vegas but that after a while she was unable to afford gas for the daily trips between Las Vegas and her grandmother's house on the reservation. As a result, she would stay with friends in Las Vegas, or when that was not possible she would study and sleep

---

[1] Recodo was unmarried at the time of Michael's birth, and no father is listed on Michael's birth certificate. Recodo named Steven Michael Bourgoise as the putative father, but the actual identity of Michael's father is unknown. The putative father was deemed, pursuant to NRS 128.012, to have abandoned Michael by conducting himself in a manner evincing an intent to relinquish all claims to Michael for a period of six months.

in the car. Recodo also testified that at this point her financial situation was so bad that often she would not eat for days just so she could afford to drive to Las Vegas to attend school and to try to find a job. Around May 1993, Recodo's car broke down, and her grandparents sold it to her aunt and uncle. Recodo stated that she would either ride her bike or try to get rides with friends into Las Vegas to look for work, to appear in court, and to visit Michael at Childhaven, the state facility where Michael was eventually placed.

Michael was initially placed temporarily with Native American foster parents. McEwan testified that because Michael was not a large enough percentage of Native American, he did not fall under the Indian Child Welfare Act and was not eligible for enrollment in any tribe. Technically, McEwan should not have been funding his placement, but she placed Michael because Recodo was Native American, because Michael needed help, and because it was for the purpose of family reunification. Michael's placement with the foster family was supposed to allow Recodo to maintain contact with Michael while she obtained her GED and sought employment and also to allow Michael to be in a safe environment in which he would be taken care of. According to McEwan, during Michael's stay in foster care, Recodo did not maintain regular contact with Michael, take Michael back on weekends, look for a job, or go to counseling. Cynthia Blaya, Recodo's DCFS caseworker, stated that she believed that Recodo had received her GED despite being involved in an altercation with another student and the teacher and being asked to leave the class, but McEwan testified that she did not believe that Recodo obtained a GED.

In the middle of June 1993, Michael's stay with the foster family ended because of problems in the foster home. Because, as noted above, McEwan could not fund Michael's placement in a foster home, McEwan contacted Roger Thiriat of Clark County Child Protective Services (CCCPS) on June 21, 1993, regarding placing Michael under state care. Michael stayed at his great-grandmother's house for a week before CCCPS picked him up and placed him in Childhaven. During that week, Michael's great-grandmother was unable to properly care for him because of her health problems, and most of Michael's care was being provided by his fifteen-year-old aunt. Recodo's grandmother told McEwan that Recodo had threatened to kill McEwan if she tried to move Michael from the home.

On June 25, 1993, Thiriat contacted Recodo about Michael's impending placement in Childhaven. Recodo told him that she was living with a male friend in Las Vegas and was unable to care for Michael. Accordingly, Thiriat filed a petition pursuant to

NRS Chapter 432B alleging that Michael was a neglected child. Recodo admitted the petition on July 8, 1993.

On August 4, 1993, Michael was adjudicated a neglected child and made a ward of the Eighth Judicial District Court, Juvenile Division. He was placed into legal custody of the Division of Child and Family Services (DCFS) on August 4, 1993. On August 31, 1993, a case plan was established for Recodo. The plan required that Recodo: (1) maintain steady employment; (2) maintain steady, suitable, and appropriate housing; (3) complete a parent effectiveness training program; (4) maintain regular visits with Michael; (5) undergo individual and family therapy; (6) at least monthly, keep DCFS apprised of her address and telephone number; and (7) pay child support of $100 a month.

In September 1993, Michael was removed from Childhaven and placed with a second foster family. Recodo saw Michael in February 1994 on his second birthday, one time in October 1994, one time in December 1994, and one other unspecified time at the CCCPS office.

The initial judicial review of Recodo's case was held on October 5, 1993. The district judge found that Recodo had made regular visits to see Michael during his time at Childhaven but that she had not made any great progress toward reunification.

In October 1993, Recodo married Joachim Recodo (Joachim), a native of the Philippines, but Joachim was in this country illegally.[2] In February 1994, Recodo told Cynthia Blaya that Joachim was being deported to the Philippines and that she was now ready to work towards reuniting with Michael.

Between February and April of 1994, Recodo apparently had two different jobs. First, she was working as an unarmed security guard at Wells Fargo. That employment lasted only about three months because Recodo was terminated when she allegedly made threatening remarks to a fellow employee. For a brief period, Recodo also worked at the Santrop Convenience Market as a clerk and cashier. This employment ended because Recodo was allegedly rude to a customer. According to Recodo, she remained unemployed for the next six to eight months.

In April 1994, DCFS had a second hearing in district court regarding Recodo's progress. The DCFS report indicated that Recodo had not contacted it for five of the six months in the reporting period. During this hearing, the court warned Recodo that if she did not make progress between that time and the next hearing, DCFS would begin the termination of Recodo's parental rights.

---

[2]Recodo testified that the marriage was null and void because she had never obtained a legal divorce from Decespedes.

In September 1994, Recodo was indicted for the non-probationary offense of bank fraud along with her ex-husband, Fernando Decespedes, and another man. At the time of the termination proceeding, another hearing on the bank fraud charges was scheduled for May 22, 1995. According to Recodo, Decespedes coerced her into participating in the crime by holding a gun to her head and telling her that she was a lousy mother who would never amount to anything. Then he pulled the trigger on an empty chamber. He then persuaded Recodo to assist him in the crime by confronting her with her inability to fulfill the case plan by obtaining transportation and insinuating that after the crime was committed she would be able to afford to obtain transportation.

On November 30, 1994, the State filed a petition to terminate Recodo's parental rights. The State claimed that under NRS 128.014 Recodo had neglected Michael by failing to provide him with such things as proper parental care, necessary subsistence, education, and medical care. The State also charged that Recodo was an unfit parent for failing to provide Michael with proper care, guidance, and support. The State noted in its petition that Recodo had been given a substantial amount of time to remedy the conditions that led Michael to being placed in foster care.

At the time of the petition, Michael had been residing in a prospective adoptive foster home since September of 1993. Ruth, the foster mother, testified at the termination hearing that she and her husband wished to adopt Michael.

The termination proceedings commenced on April 21, 1995. McEwan testified that after Michael had been placed in state custody in 1993, she did not hear from Recodo for "many, many months." Then Recodo contacted her in late 1994, and from November 1994 through February 1995, McEwan had "very heavy contact" with Recodo. McEwan testified that since November 1994, she had seen more of an effort on Recodo's part to turn her life around: with the financial help of her grandmother, Recodo had bought a car; she had been seeing a psychologist; she had made a more concerted effort to maintain employment; and between November 1994 and April 1995 she only lost contact with DCFS one or two times. McEwan also testified that she worked with Recodo to help reunite her with Michael by helping Recodo budget her money so that she could get her own place to live and a regular means of transportation, setting up a specific schedule to visit Michael while he was in the custody of the state, and referring Recodo to Dr. Waldmeyer, a psychologist for the tribe. Recodo also saw another therapist fairly regularly from November 1994 until February 1995. In March 1995, Recodo applied and was accepted for unemploy-

ment benefits, and McEwan stated that a day care facility suitable for Michael's needs had opened on the reservation and that social services, such as Indian general assistance and McEwan's service section, were available to help both Recodo and Michael. As far as terminating Recodo's rights to Michael, McEwan testified that although Recodo had been unreliable in the past in following through on required adjustments, she would like to see her have another chance.

Veronica Jean Amiano, a social work supervisor with DCFS, testified at the termination hearing as follows. On June 3, 1994, Recodo came to the division office and was agitated, upset, and used quite a bit of profanity. She requested to talk to Amiano privately, and in Amiano's office Recodo expressed her annoyance with the termination proceedings and her frustration that she did not seem to have a way to actually get Michael back. She told Amiano that she had a good mind to blow up the division office and take her son. She told Amiano that she was out of her anti-anxiety prescription and that the Indian Affairs Office had not helped her to renew it. Recodo told Amiano that she felt like she was giving up on her son and that the DCFS should draw up the relinquishment papers and let her know when to come in and sign them, and on September 24, 1994, Recodo called Amiano again and repeated this request.

Cynthia Blaya, Recodo's DCFS caseworker, testified that the biggest impediment to Recodo's possible reunion with Michael was her inconsistencies. These included her inability to maintain steady employment, find appropriate housing, and maintain a regular visitation schedule with Michael. Blaya stated that from August 1993, when the State obtained custody over Michael, to April 1995, the time of the termination hearing, she saw very little progress from Recodo. She also stated that since the initial October 5, 1993 court review, Recodo had not provided verification of progress on her case plan, although Recodo had completed parenting classes in February 1994. Additionally, by the time of the termination proceeding, Recodo had only paid $160 in child support.

On May 31, 1995, the district court granted the State's petition to terminate Recodo's parental rights to Michael. The district court concluded that Recodo was an unfit parent as defined by NRS 128.018 (defining unfit parent as one who has by his or her own fault failed to provide the child with proper care) and NRS 128.106 (listing specific considerations in determining neglect by unfit parents). Additionally, the district court found that Recodo had failed to adjust to become a reasonable parent within a reasonable period of time as defined by NRS 128.0126.

Recodo now argues that no clear and convincing evidence

existed to support the district judge's conclusion and further that her due process rights were violated because she was not afforded counsel throughout the entire termination process.

## DISCUSSION

The power to terminate parental rights is an "awesome power." Champagne v. Welfare Division, 100 Nev. 640, 645, 691 P.2d 849, 853 (1984). This court has characterized the termination of parental rights as a civil death penalty. Drury v. Lang, 105 Nev. 430, 433, 776 P.2d 843, 845 (1989). Consequently, a termination of parental rights must be scrutinized closely on appeal. Kobinski v. State, 103 Nev. 293, 296, 738 P.2d 895, 897 (1987).

Two kinds of grounds must be considered in termination proceedings. *Champagne,* 100 Nev. at 646-47, 691 P.2d at 854. "[T]here must be *jurisdictional* grounds for termination—to be found in some specific fault or condition directly related to the parents—and dispositional grounds—to be found by a general evaluation of the child's best interest." *Id.* at 647, 691 P.2d at 854. Both grounds must be established by clear and convincing evidence. *Id.* at 648, 691 P.2d at 854. However, this court will uphold an order of termination if it is based on substantial evidence and will not substitute its judgment for that of the trial judge who heard and observed the witnesses. *Kobinski,* 103 Nev. at 296, 738 P.2d at 897.

The district court found that jurisdictional grounds existed pursuant to two factors listed in NRS 128.105. The first was Recodo's parental unfitness. *See* NRS 128.105(2)(c). The term "unfit parent" as used in NRS 128.105 is defined as "any parent of a child who, by reason of his fault or habit or conduct toward the child or other persons, fails to provide such child with proper care, guidance and support." NRS 128.018. This court has explained that

> all parents are guilty of failure to provide proper care on occasion; and a parent does not deserve to forfeit the sacred liberty right of parenthood unless such unfitness is shown to be severe and persistent and such as to render the parent *unsuitable* to maintain the parental relationship.

*Champagne,* 100 Nev. at 648, 691 P.2d at 855 (footnote omitted). The term "unsuitable" is used to describe "a parent who by reason of persistent fault or state of incapacity deserves to have

his or her parental rights terminated or who must sacrifice such parental rights in the interest of the child, by reason of irremedial inability to function as a proper and acceptable parent." *Id.* at 648 n.5, 691 P.2d at 855 n.5.

Pursuant to NRS 128.106(8), a condition which diminishes the suitability of a parent is the

> Inability of appropriate public or private agencies to reunite the family despite reasonable efforts on the part of the agencies.

After reviewing the record in the present case, we conclude that clear and convincing evidence of Recodo's unfitness existed. The district judge concluded that the efforts of DCFS were reasonable and that they even found substitute care for Michael so that Recodo could find housing and employment and could establish stability in her life. The district judge also concluded that testimony proved that even after Recodo was relieved of the obligations of caring for Michael she did nothing to help establish stability in her life which she needed to care for Michael. This constitutes clear and convincing evidence of Recodo's irremedial inability to function as a proper and acceptable parent.

The second jurisdictional ground was a failure of parental adjustment. NRS 128.105(2)(d). The district court concluded that Recodo was unable or unwilling within a reasonable time to substantially correct the conditions which led Michael to be placed outside her home. In August 1993, Michael was adjudicated to be a neglected child and was placed in the custody of DCFS. A case plan for Recodo to follow in order to achieve reunification with Michael was formulated at that time. Termination proceedings were commenced in November 1994. NRS 128.109(1)(b) allows a finding of failure of parental adjustment if a parent fails to substantially comply with "the terms and conditions of a plan to reunite the family within 6 months after the date on which the child was placed or the plan was commenced, whichever occurs later."

Recodo was given well over a year to adjust and provide a suitable and stable environment for Michael. The evidence indicates that Recodo's overarching and uncorrected problem was chronic instability in her employment, housing, and contacts with Michael. From the time the case plan was formulated in August 1993 until the final termination hearing in April 1995, Recodo did not maintain steady employment or stable housing, and she went through at least three jobs, two of which ended because of her volatility. She frequently changed her living arrangements

and was unable to maintain a stable living arrangement to bring Michael back into. Throughout these two years, her contact with DCFS and with Michael was sporadic; between approximately October 1993 and April 1994, it was non-existent.

We conclude that over one and one-half years was a substantial amount of time to keep Michael in suspense while his mother tried to adjust. Champagne v. Welfare Division, 100 Nev. 640, 651, 691 P.2d 849, 857 (1984). Nothing indicates with any certainty that additional services would bring about a lasting parental adjustment on the part of Recodo. *Id.* at 652, 691 P.2d at 858. Therefore, we conclude that the evidence constituted sufficient jurisdictional grounds to allow an evaluation of the dispositional grounds.

We have also considered the district court's analysis of the dispositional grounds. Testimony was presented that Michael is thriving in his foster home, where he has been since 1993, and that the foster parents wish to adopt Michael. Additionally, testimony indicated that Michael's present living situation is in stark contrast to the instability he experienced prior to being placed in the foster home. Veronica Amiano explained why she felt the termination and subsequent adoption of Michael by his foster parents was in the child's best interest.

> Michael is a very bright little boy. When he first was placed in foster care, he didn't have a lot of structure. He needed someone with strong parenting skills to keep him in control. He's very assertive and to take that energy from being aggressive to assertive. This family has been able to work with him along that line.
>
> . . . .
> . . . I feel that these foster parents have strong parenting skills. They certainly have incorporated him into their family. He calls them Mom and Dad, which is typical of any foster child, so that's not unusual. And, he's just feeling very a part of them.

We therefore conclude that clear and convincing evidence existed to support the district judge's conclusion that Michael's best interests would be served by terminating Recodo's parental rights.

Finally, Recodo argues that her due process rights were violated because she did not have counsel appointed at all stages of the proceedings. This court has stated that as a matter of due process, "parents are entitled to: (1) a clear and definite state-

ment of the allegations of the petition; (2) notice of the hearing and the opportunity to be heard or defend; and (3) the right to counsel.'' Matter of Parental Rights of Weinper, 112 Nev. 710, 713, 918 P.2d. 325, 328 (1996).

Recodo did not have an attorney until the final termination proceeding, but she did have an attorney present at that hearing to protect her interests. Therefore, we conclude that Recodo's due process rights were not violated and that her liberty interest was properly protected at the actual termination hearing.

## CONCLUSION

The district judge's determination that both jurisdictional and dispositional grounds existed was supported by clear and convincing evidence. Furthermore, Recodo's due process rights were not violated because she was represented by counsel at the final termination hearing. Accordingly, we affirm the district court's order.

STEFFEN, C. J., and YOUNG, J., concur.

SHEARING, J., concurring:

I agree with the reasoning and result in the majority opinion. However, I feel compelled to write a concurring opinion to respond to JUSTICE SPRINGER's dissent.

JUSTICE SPRINGER states, ''I do not understand fully what public policy or political agenda has brought about the plethora of parental terminations or why the State appears to these parted parents and their attorneys to be so intent on dissolving the families of the poor, powerless and handicapped.'' In each case affirmed by this court, the parental rights were terminated because the parent or parents irrefutably demonstrated their inability to care for their children.

There is nothing arbitrary about a standard for termination that incorporates consideration of a parent's acts and failures to act. Where a mother refuses to care for her son, voluntarily gives him to foster care, and then does not even bother to see the child for months on end even though she is in the same town, these acts should count against her. In the case of Recodo, she obviously displayed mixed feelings about her son by stating at various times that she wanted to relinquish her parental rights. Recodo took advantage of some of the assistance offered to her, such as parenting classes and therapy, but did not follow through on other assistance. It is true that Recodo was poor at the time of termination, but it appears she squandered several opportunities given to · her to escape poverty. She was asked to leave school and three different jobs because she fought and/or made threats on the job.

Recodo also threatened to blow up state offices and was indicted for bank fraud.

One may sympathize with Recodo for her personal problems, but the fact remains that, at the time of the hearing, she had left her son in the care of others for two years with only sporadic contact. Her three-year-old son also deserves some sympathy for the instability in his life due to his mother's actions. He deserves a stable loving home and parents who are willing to provide him with care and guidance, which his mother is apparently unable or unwilling to supply.

JUSTICE SPRINGER accuses the State of taking children away from their parents just because the parents are handicapped. It may be true that some of the parents who have had their parental rights taken away were handicapped. However, it is not their handicap that is relevant to the decision to terminate their parental rights; it is their inability to care for their children. There are many thousands of parents with a variety of handicaps who are perfectly capable of taking care of their children and do so.

The State only intervenes when toddlers are discovered wandering the streets alone, or are repeatedly found with bruises and broken bones due to child abuse, or are abandoned without supervision and/or food. Even then, the parents have an opportunity to show that they are capable of caring for their children, and the State provides many types of assistance to the parents to enable them to do so. The State will pursue termination of parental rights only after the parents have demonstrated, during a period that is seldom less than two years, that they are unwilling or incapable of keeping their children safe and secure. There is not one iota of evidence that the State is simply plucking children out of poor homes and placing them in "more affluent" homes, which are "more pleasing to social service agents." Rather, the evidence shows that the State attempts to place children with foster parents who are responsible, loving and caring, and my observation is that those who are willing and eager to adopt these already-troubled children demonstrate that they are indeed loving and caring. I have never observed that affluence is involved in any way!

JUSTICE SPRINGER seems to imply that in terminating parental rights, the State is passing moral judgment on the parents. That is not true. The State is only determining that the parents are incapable of keeping their children safe and secure. It may not be the parents' fault that they are incapable of caring for their children, but fault is not the important or even relevant consideration.

JUSTICE SPRINGER perceives an "epidemic" of terminations. The negative term "epidemic" is inappropriate and connotes a sinister motive on behalf of the State. That the need for termina-

tion may arise more frequently than we would wish is indeed a misfortune, but the State is responding to the needs of the children, not creating the situations which place the children at risk. In reality, termination shows compassion to children by not condemning them to live with abusive and neglectful parents and thereby preventing their growing up to repeat the cycle of violence and neglect with their own children. The overwhelming majority of defendants who have appeared before me for sentencing were subject to abuse and neglect as children. By terminating parental rights in appropriate cases, I hope that we are in the process of breaking the pattern by providing safe, loving homes to the children who are tomorrow's parents.

SPRINGER, J., dissenting:

I dissent in this case for essentially the same reasons that I dissented in Bush v. State, Dep't Hum. Res., 112 Nev. 1298, 929 P.2d 940 (1996). *Bush* was a case in which the State permanently terminated the parental rights of two parents because the court believed the parents were not smart enough to raise their two children. The case now before us is in many respects more tragic than *Bush* because this mother's children were taken away from her just because she was *poor.*

As I pointed out in *Bush,* the State's *modus operandi* appears to be to go into the homes of handicapped, powerless and usually very poor parents, remove their children (almost always without the parents' having counsel) and put the children into the home of substitute parents who are more affluent than the natural parents and more pleasing to social service agents than the natural parents. After the children are taken out of the home of their natural parents, the State imposes upon the natural parents a "reunification plan" that is frequently beyond the capacity of the parents to deal with. After the natural parents flunk the reunification test, the State files a petition to cut the natural parents off from their children permanently, and to "free them for adoption" by the Welfare-qualified, substitute parents—all under the shibboleth of "the best interest of the child."

Concurring JUSTICE SHEARING believes that the State "shows compassion" when it deprived this mother of her son. I say, "The helping hand strikes again." I have no reason to doubt that, as put in the majority opinion, the child is "thriving in his foster home"; but, in my opinion, this does not justify permanently depriving an American Indian mother of her natural son and depriving the child of his priceless heritage.[1]

---

[1] I would note that this case is the exception to the rule because there is an indication of an intention on the part of the foster parents to adopt the child. Most of the cases that I have seen of late simply terminate the parental rights

This case is only one of an ever-increasing number of cases in which destitute parents come before this court desperately pleading that their children not be taken away from them forever. There can be no doubt that over the past year the number of these cases has dramatically increased. The reason for the apparent exponential growth in parental terminations is not clear to me. Concurring JUSTICE SHEARING suggests that the rash of termination cases has been brought about "because the parent or parents irrefutably demonstrated their inability to care for their children." It does not make sense to me, however, that the number of incompetent parents in this state has all of a sudden grown to the point that this court sees two or three of these cases during each monthly oral argument session, whereas not too long ago we had this number in a year's time. It seems much more likely to me that the State's recent rush to terminate natural parental rights, particularly the rights of destitute and handicapped parents, is the result not of an overnight increase in the number of incompetent parents but rather of a conscious, executive decision on the part of welfare officials.[2]

I do not understand fully what public policy or political agenda has brought about the plethora of parental terminations or why the State appears to these parted parents and their attorneys to be

---

of the poor or handicapped parents and leave the child adrift with no parents at all. I understand the current "permanency" fad and the perceived need to place children in more "stable" homes; but this, in my view, does not necessitate permanent severance of natural parental ties, except in the direst of cases. I do not see why terminating this child's heritage by removing his Native American mother from his life can be said to be in his "best interests," especially when there is no evidence that by keeping the natural parental ties intact he would lose the "permanency" and stability that he apparently enjoys in foster placement.

[2]I wish to note, as I have in previous, similar dissents, that I do not impute bad motives to the state welfare officials. I believe that the explosion of parental rights cases arises out of good faith decisions by officials which are largely based upon a misreading of the child protection statutes and upon misperceptions as to what is in the "best interests" of children. Long-term child custody arrangements outside of the home are often necessary and in the best interest of a child; however, it is in relatively rare instances that the *only* way in which a child's best interest can be served is to take his or her natural parents away *permanently*. I do not propose, as suggested by the SHEARING concurrence, that the State is willy-nilly "plucking children out of poor homes and placing them in 'more affluent' homes"; all I am pointing to is a pattern, frequently called to our attention by attorneys appointed to represent destitute and handicapped parents (attorneys for the appeal and when it is too late to do much good for parents who have already lost their children), a pattern in which the children are taken away in a proceeding in which the parents are not represented and which result in the parents being placed in a position from which it is virtually impossible for them to get their children back.

so intent on dissolving the families of the poor, powerless and handicapped. One possible explanation for it all can be found in the change in the law in 1987, when NRS 128.105 was amended to provide that the "primary consideration in any proceeding to terminate parental rights must be whether the best interests of the child will be served by termination." This amendment provides no justification for the run-away parental terminations that we are now experiencing. The best interests of the child has always been the "primary" consideration in judging the dispositional grounds for termination. *See, e.g.*, Champagne v. Welfare Division, 100 Nev. 640, 691 P.2d 849 (1984); Chapman v. Chapman, 96 Nev. 290, 607 P. 2d 1141 (1980). As I noted in my dissent in *Bush*, it appears likely that the statutory amendment has been misread to say that the best interests of the child is the *only* consideration necessary in order to terminate the parental rights of poor and handicapped parents.

In *Bush,* the State took the Bushes' children out of the home of their handicapped parents and placed them for adoption in a "better" home. In the present case, the State took a child away from a poor mother because she was "without independent housing, employment and appropriate finances, and unable to provide adequately for the physical, emotional and financial needs of her son,"[3] and then terminated her parental rights because the mother was found to have "chronically failed to complete the [reunification] case plan." I see the present case as being very similar to the *Bush* case, except that the child's mother, Ms. Recodo, was not mentally handicapped, as were the Bushes.

The mother in this case, Adrina Recodo, is enrolled with the Goshute/Shoshone Indian Tribe. She asserts herself, as put by the trial judge, "very strenuously about her American-Indian heritage" and "asserts that there is a long tradition of welfare agencies taking Indian children from parents and allowing adoption by other families." The trial court took the position that "permanency" was more important than the boy's Indian heritage, stating that "[r]egardless of his heritage, Michael is entitled to a permanent, stable, and loving home" and "that even if adopted by non-Indian parents, his heritage" can still be preserved.

I see the State's permanent exclusion of this American Indian boy's natural mother from his life as an example of the pattern outlined in the *Bush* dissent. The child's mother was destitute, and it may have been necessary and advisable that the child be placed for a limited time in temporary foster care; however, as in so many cases, temporary really means permanent. Once the

---

[3]Petition filed July 2, 1993.

child was taken away from the mother, the usual disastrous problems ensued. Let me now recount from the record how this tragedy took place.

Adrina Recodo was the victim of an abusive domestic relationship, and she sought the help of a social worker on the Paiute Reservation, stating that she was having problems taking care of her son after she got out of the relationship. She told her caseworker that she had no income, no place to live and no transportation. In need of money, food and a place to live, the State's response was to send Ms. Recodo to a psychologist. The State also decided to take her son away from her and to place him in foster care. Ms. Recodo was destitute; and on many occasions she was faced with the choice of eating or spending the money on transportation that would take her to school or to try and find a job. She received no State assistance in obtaining housing, although obtaining adequate housing was made a condition of the reunification plan. My reading of the record tells me that it was unfair for the court to hold, under these circumstances, that Ms. Recodo flunked the reunification test.

The trial judge stated in his written Decision that "the [Welfare] Division cannot be expected to get Recodo a job, a home, and to provide financial stability." Such a statement, to my way of thinking, wrongly justifies the position apparently taken by the State in this case: "Get a job; get a home; and get financial security—or lose your son permanently." Certainly Ms. Recodo *tried* to do something about her destitution. Deborah McEwan, Director of Social Services for the Moapa Band of Paiutes, testified that it was a "[p]retty fair assessment" when counsel asked if Ms. Recodo "tries so hard to improve herself [that] she bites off more than she [can] chew . . . and sometimes fail[s] when she over shoots what she believes she's going to be able to accomplish." Ms. Recodo tried to keep the State from taking her child away from her, but did not quite make it.

Ms. Recodo's social worker recognized that, among many problems, transportation was a major problem for Ms. Recodo:

> The reservation is in a very rural area and commuting to Las Vegas is fifty plus miles. And, we had at that time no suitable day care at the reservation. He was an infant. We had Head Start, but there was no way for her to leave him.

The record is replete with descriptions of the almost insurmountable obstacles put in the way of Ms. Recodo by the State. I do not undertake in this dissent to present a complete account of the tragic conditions that resulted in Ms. Recodo's son being placed in a non-Indian home and taken away from his mother forever; but I do want to say that my reading of the record tells

me that Ms. Recodo did not, under *Champagne,* "deserve" to lose her child permanently. 100 Nev. at 648, 691 P.2d at 855 (footnote omitted).

With regard to dispositional grounds, I certainly do not believe that "under no reasonable circumstances [will] the child's best interest be served by sustaining the parental tie." *Id.* at 652, 691 P.2d at 858. There are many reasons for not severing the parental tie in this case. We recognized in *Champagne* that "there does come a time when society must give up on a parent. A child cannot be kept in suspense indefinitely." *Id.* at 651, 691 P.2d at 857. In my opinion, much of the "suspense" caused in this case was caused by the State itself in not giving more assistance to a woman who was living under extremely trying circumstances. The time had not come to "give up on" this mother.

The trial court made the sad observation that "[t]he difficult aspect of this case is the realization that one day Recodo may determine that Michael is a priority and make the progress necessary to reunify with Michael." The trial court recognized the possibility that Ms. Recodo was going to make the "progress necessary" to place this child back with its mother. In my view, termination of this mother's parental rights was premature and unseemly. I would reverse the termination order.