Springer, J.,
dissenting:
I have had occasion to file dissents in termination of parental rights cases five times in the past fourteen months.[1] In these dissents I have noted what appears to be a new public policy instituted by the State in these matters. The State’s policy appears to have led to an escalating number of termination cases brought by the State, particularly with respect to parents who are poor or disabled. What strikes me as being most troublesome about the State’s new policy is that termination of parental rights in each of the five mentioned cases in which I have dissented has been unnecessary and contrary to the best interest of the children as well as the parents. It is one thing to remove a child, in the child’s best interest, from the home of poor or mentally disabled parents; it is quite another thing to sever the natural parents’ rights just because the children have been placed in what state welfare officials see as a “better” home.
In none of the five cases in which I have dissented has the court made a specific finding in accordance with Champagne v. Welfare Division, 100 Nev. 640, 652, 692 P.2d 849, 858 (1984), that “under no reasonable circumstances [can] the child’s best interest be served by sustaining the parental tie.” What the State seems to be doing, time after time, is simply weighing the new foster home against the home of the poverty-stricken or handicapped natural parents and pleading to the court that it is in the best interest of the child that the child be given some new parents.
In at least some among the rash of recent termination cases I have been satisfied that the welfare of the children would probably be best served by permitting the children to remain for the time in the foster home, but this fact certainly does not justify severing all parental ties with the natural parents, forever.
The present case presents perhaps the most pernicious example of the consequences of the State’s new parental termination policy. In this case, with no conceivable benefit to the mother or child, the State terminated the mother’s parental rights. The consequence of the termination was that the child had a father but no mother. As in all of the other mentioned cases in which I have dissented, I find no advantage to the child that can result from the *1201 elimination of one of its parents. Permanently dissolving the mother-child relationship in this case because the mother was immature just happens to be the most horrible example of the excesses being engaged in by the State in the name of the “best interests” of children.
Ms. Cooley, the former mother of the now-motherless child in this case, is not a vampire, she is just an immature teenager. We have here an unmarried teenage mother who loves her child but who was forced to give up custody of her child while she was struggling for existence in the grossly inadequate home of her mother. As I see it, we are witness in this case to the development of a new “virtual” ground for termination of parental rights. Added to the customary grounds of poverty and disability we now have the new judicially-created ground for termination, “immaturity.”[2] This mother was only fifteen when she gave birth to her daughter Christina; and, rather than give this teenage mother a chance to grow into a state in which she could have responsibly assumed the duties of motherhood, the State rushed to take her *1202 motherhood away from her and, with the help of this court, has vested exclusive parenthood in the mother’s teenage boyfriend, the father of the child.
When I refer to the ground of “immaturity” as being added to the customary grounds of “poverty” and “disability,” I am, of course, being rhetorical. I realize that poverty, disability and immaturity do not, in these terms, provide statutory grounds for termination of the right of a natural parent; I am merely saying that in actuality poverty, disability or immaturity are being successfully used by the State as de facto grounds for termination in case after case that I have observed coming before this appellate court. This being said, I will go on to describe how poverty and temporary immaturity (“temporary” unless we agree with the trial court that this teenage mother is permanently immature) have caused this child to be separated from her mother forever.
A closer examination of the facts in this case reveals the tragedy of having permanently taken this child away from her mother. I take the following facts directly from the State’s brief. The State tells us that Ms. Cooley and her family have a record of poverty and “a long history with the Division.” Ms. Cooley “and her family were being evicted shortly after Christina was born, and Cooley had no place to go with the baby.” After the eviction, Ms. Cooley and her child temporarily lived with her boyfriend’s mother, after which Ms. Cooley and her child moved back in with Ms. Cooley’s mother. According to the State, Ms. Cooley and her child were there exposed “to appalling living conditions and overcrowded conditions.” “There were as many as nine people living in the mobile home, including two girls with infants.” Backed-up toilets remained unrepaired, and the place was generally a “disaster.” One observer saw candle wax on the carpet, “where some one burned a candle on the rug,” apparently in a feeble attempt to acquire some light or heat in the place.
The condition of Ms. Cooley’s mother’s abode and “nonpayment of rent” caused the family to be evicted again in January of 1994, when Christina was only five months old.
Where Christina and her mother lived for the next several months is not clear; but, “on April 6, 1994, because Cooley signed a voluntary placement agreement admitting she could not care for the child and needed some help,” state welfare officials removed Christina from Ms. Cooley’s custody.
After Christina’s removal Ms. Cooley continued to live with her mother in the worst of circumstances, often without electricity, and in circumstances in which the child could not properly be immediately returned to her mother. The State did make some attempts to “reunite” Ms. Cooley with her daughter, principally by ordering her to attend parenting and Homemaker sessions. *1203 The State’s account of its attempt to make a suitable mother and homemaker out of the homeless Ms. Cooley shows, understandably, that very little progress was made along these lines. The record shows that the immature Ms. Cooley often “giggled” during training sessions and “did not pay enough attention to learn what was presented to her.”
I have no reason to question the State’s judgment that at the time this young mother was fifteen and sixteen years old and forced to live with her mother in the squalid conditions that I have described, placement of Christina with her mother, at least temporarily, was inappropriate. It may have been in this child’s best interest that she be removed from her mother’s custody for a while. What is clearly not in the best interest of the child or the best interest of the mother is the permanent severance of the mother’s parental rights. This point is well made by Ms. Cooley in her Reply Brief:
If [Ms. Cooley’s boyfriend] fails as a parent and this termination is affirmed, Christina essentially will become an orphan who will be raised by her grandmother or in foster care. She would be precluded from being raised by her mother who, by then, may have learned from her mistakes and corrected her shortcomings.
On the other hand, what harm is done to Christina by reversing the termination and allowing Marla [Cooley] to continue to be a party to Christina’s NRS 432B case? As was emphasized in the Opening Brief and ignored by the State, this is not a custody battle. Unless future circumstances warrant it, Christina’s placement with her father will not change. There is no reason that any adjustments in Christina’s placement cannot be properly resolved by future custody hearings. So long as [Ms. Cooley’s boyfriend] is a fit parent and until Marla matures and realizes the need to develop her parenting skills, the father would retain physical custody of Christina. DCFS would only need to deal with Marla once every six months at a review hearing until such time as she decided to actively pursue her case plan and become a responsible parent.
Normally, termination is necessary to free the child for adoption, but that is not the case here as Christina is not being adopted. All termination would accomplish for Christina is to limit her options in the future by eliminating any possibility of contact with her mother until adulthood. The permanent severance from her mother is not in this young girl’s best interests.
It is also difficult to understand why the State wants to terminate Marla’s responsibility to support her daughter.
*1204 The State apparently assumes that Marla will be an immature teenager forever. The State is, therefore, willing to forgo the possibility of any support payments that otherwise would accrue over the next fourteen to fifteen years. That seems to be a substantial price to pay to remove Marla from the DCFS caseload.
(Emphasis in original.)
I would not, as does quoted counsel, go so far as to blame Ms. Cooley’s tragic loss of her daughter (termed by this court as the “Capital Punishment of Welfare Law”) on the State’s desire to reduce its “caseload”; but I simply cannot find any benefit to either the child or the child’s mother to be derived from adjudicating Ms. Cooley’s boyfriend to be the sole parent of the child born to Ms. Cooley.
Termination in this case meets neither the jurisdictional grounds nor the dispositional grounds set out in Champagne v. Welfare Division, 100 Nev. 640, 692 P.2d 849 (1984); and, more importantly, Ms. Cooley’s constitutional rights, state and federal, have been violated by the State’s groundless permanent severance of her parental rights.

 Matter of the Parental Rights of Gonzales, 113 Nev. 324, 933 P.2d 198 (1997) (parent temporarily indisposed and unable to attend to parental duties); Matter of Parental Rights as to Bow, 113 Nev. 131, 930 P.2d 1128 (1997) (abject poverty); Matter of Parental Rights as to Deck, 113 Nev. 124, 930 P.2d 760 (1997) (schizophrenic parent); Matter of Parental Rights as to Bush, 112 Nev. 1298, 929 P.2d 940 (1996) (mentally deficient parents); Matter of Parental Rights as to Weinper, 112 Nev. 710, 918 P.2d 325 (1996) (fraudulently presenting duplicate of prior welfare report in lieu of current status report and not informing court of events during review period denies parent opportunity to comply with reunification plan).

 The actual, stated grounds employed in this case and in the other poverty/ disability cases that are of concern to me are not, of course, poverty and disability but, rather, euphemisms for poverty and disability, words like “abandonment,” “neglect,” and failure to provide “token efforts to support.” In her opening brief, this mother describes the grounds for termination used by the State against her as “boiler plate,” and I agree. In all of these cases the State contrives some kind of “abandonment” as a grounds for termination and attempts to show that the mother has failed to support her child and that, therefore, the parental relationship should be severed. I find it interesting that all of the legal grounds for termination pleaded by the State in this case are incidents of this mother’s immaturity or her abject poverty; e.g., that she has not “even provided any token efforts to support Christina,” that she “has not provided emotional support for Christina,” that she “has not nurtured Christina,” and, most significantly, that she is “unable or unwilling to provide for Christina’s proper physical . . . development.” (State’s Answering Brief at 8; my emphasis.) As is shown in the text, during most of the time after the birth of her child this mother was forced to live in squalid conditions of ground-down poverty. It is true that for a period of time neither Ms. Cooley nor her mother (with whom she and the child lived) were financially able to provide for the child, physically or otherwise. What I find to be wrong about this case is that the trial court adjudicated this mother to be permanently immature and poor, groundlessly predicting and ruling that she “will continue in the future to neglect Christina.” (Id.)
With particular reference to immaturity as a “ground” for termination, I note that the trial court made a specific “conclusion of law” that this mother caused “distress” to her child by reason of the mother’s “immaturity, selfishness and indifference.” One of the principal witnesses for the State, Susan Hutchinson, Visiting Homemaker III, answered in the affirmative when she was asked if it was “[flair to say that what you were dealing with was — well, immaturity, to a large extent?” Perhaps the majority is not, as it claims, “affirming termination . . . based on [the mother’s] immaturity”; still, it is clear to me that the trial court based its conclusion of law on “immaturity, to a large extent.”