IN THE MATTER AS TO THE PARENTAL RIGHTS AS TO CHRISTY AMBER DECK, MICHELE JEAN DECK AND WILLIAM DUPREE, APPELLANTS, v. THE STATE DEPARTMENT OF HUMAN RESOURCES, DIVISION OF CHILD AND FAMILY SERVICES, RESPONDENT.

No. 27260

January 4, 1997 930 P.2d 760

*Vincent Ochoa,* Las Vegas, for Appellant Deck.

*Ronald W. Rovacchi,* Las Vegas, for Appellant Dupree.

*Frankie Sue Del Papa,* Attorney General, Carson City, and *Linda C. Anderson,* Deputy Attorney General, Las Vegas, for Respondent.

# OPINION

By the Court, STEFFEN, C. J.:

This appeal challenges the district court's judgment terminating the parental rights of Michele Jean Deck, the mother of Christy Amber Deck ("Amber"), and William Dupree, putative father of Amber. Although this is one of the more troubling of these heart-wrenching cases, we conclude that the district court did not err in its judgment and therefore affirm.

## *FACTS*

Christy Amber Deck was born to appellant Michele Jean Deck on September 5, 1989; no father's name appeared on the birth certificate. Less than three months prior to Amber's birth, thirty-five-year-old Michele, who had been declared unable to manage her own affairs, was placed under the guardianship of the Public Administrator. She was diagnosed as suffering from paranoid schizophrenia.[1] A protective service agency officer filed a petition alleging that Michele's "mental condition and capabilities are impaired to the degree that she is unable to provide properly for the needs of the minor." Within three days of her birth, the infant was placed in the care of her maternal aunt and uncle, Susan and David Nelson. On September 29, 1989, Michele, appearing with her counsel, admitted that her mental condition and capabilities did not enable her to provide properly for Amber's needs.

A reunification case plan was adopted by the Juvenile Court on January 6, 1990, requiring Michele to: (1) receive counseling through Las Vegas Mental Health; (2) take prescribed medication; (3) pay child support in the amount of $10 per month; (4) maintain monthly contact with her social worker; and (5) maintain monthly supervised visits with Amber.[2] The goals of the case plan were:

---

[1]Michele had experienced periodic auditory and visual hallucinations and violent mood shifts.

[2]The report recognized that Michele was unhappy without her daughter, and Michele notes that the report also stated that Michele was functioning at her peak level and "is *able* to function on a level that will enable her to provide adequately for herself or the child." (Emphasis added.) Unfortunately, it is most likely that the report intended to declare Michele *unable* to function at such a level, as the previous page of the report indicated that

A.  Proper care and placement of [Amber] during the time she is in the custody of the Division [Division of Child and Family Services].

B.  Strengthening the family unit.

C.  Reuniting the family, if possible.

D.  If reuniting is not possible, choosing other alternatives.

The plan also characterized Michele's behavior as having been disoriented, hostile, and belligerent towards family members and the Juvenile Court Services. Annette Simmons, Michele's case-worker throughout the six-year period of her case, filed case reports approximately every six months with the Juvenile Court.

## FIRST CASE REPORT

The first case report, in contrast to the initial case plan hearing where Michele appeared in court "wild looking," "very hostile and agitated," reflected Michele's behavior as cooperative and controlled. Michele was receiving counseling, taking her medication daily, meeting with her mental health caseworker and maintaining monthly contact with her social worker. Unfortunately, she had requested only three visits with Amber, who was ten months old at the time of this report. The report, noting the importance of contact between mother and child, stated that Amber was adjusting well in the Nelson home and responded happily to the Nelsons and Michele during visits.[3]

The report outlined a new "Long-Term/Permanency Plan" prompted by an evaluation of Michele by the Division's contracting psychiatrist, Dr. Forbes. The new plan contemplated Amber's permanent placement in the Nelson home, under a legal guardianship, based upon Dr. Forbes' determination that Michele's mental instability was a permanent condition.[4] However, the report also stated that Michele did not consider her condition permanent, and felt that in time her health would

---

"Michele Deck is *incapable* of caring for herself adequately . . . [and that] Michele is, at this time, *completely unable* to provide [Amber] with a healthy, safe, secure and stable home environment, which is what [Amber] desperately needs." (Emphasis added.)

[3]The report noted that Michele frequently expressed frustration over her sister Susan's role as Amber's provider. Also, Michele's indication that Susan suffered from chronic alcoholism proved to have a non-problematic foundation.

[4]The possibility that Michele might never be able to regain custody of Amber was recognized in the first dispositional report filed on October 24, 1989, wherein the Protective Service Officer observed that "the subject minor cannot be placed with her natural mother *and may never be able to be placed with her mother unless some medication can be found to stabilize her.*" (Emphasis added.)

improve and she would be able to secure a full-time job to support Amber.

## THE SECOND REPORT

The second case report, filed on February 27, 1991, indicated that Michele was still receiving counseling and meeting with her mental health caseworker. She also appeared to be taking her medication and continued to be "very cooperative" with the Division. However, the report expressed concern that Michele was not progressing; she was not paying any support, had not made monthly contact with her social caseworker, and had requested only three visits with Amber despite her awareness that she could visit her daughter more often than once per month. The Division maintained that such visits were essential to Michelé and Amber's emotional support.

## THE THIRD REPORT

Much like the second report, this report, filed on August 28, 1991, reflected that Michele continued to receive counseling and was meeting with her mental health caseworker and that it appeared that she was taking her medication. Notably, however, Michele had again requested only three visits with Amber, had paid no support, and had only made minimal contact with her social caseworker. The Division expressed concern that more contact between the mother and her daughter was necessary to preserve a parent/child relationship.

## THE FOURTH REPORT

This report, filed February 26, 1992, revealed that on December 25, 1991, Michele gave birth to a son, Joseph Dupree. Although officials expressed concern over Michele's ability to care for her new baby, she was allowed to keep her son with weekly monitoring from Child Protective Services and a public health nurse. Michele regularly informed the social worker of Joseph's progress and also paid $120 in support for Amber, leaving an arrearage of the same amount. The report failed to indicate the number of visits Michele requested with her daughter, but did note that Susan Nelson and Amber visited Michele and her new son Joseph on a regular basis at Michele's home. The report also indicated that Amber had adjusted well to the Nelson family.

## THE FIFTH REPORT

Filed on September 24, 1992, the fifth report indicated that in April of the same year, Michele and Susan had a consultation

with Dr. Forbes. The doctor determined that Michele was in advanced stages of schizophrenia and could not take care of Joseph or Amber on a long-term basis.[5] An unannounced visit to Michele's home was positive, and Michele was pleasant and cooperative. Joseph appeared to be in no distress. Notably, however, Michele's contact with Amber was described as "minimal" and the mother had paid no support. At the Nelson home, Amber appeared "happy, healthy, and content."

## THE SIXTH REPORT

This report, filed March 14, 1993, again described Michele's contact with Amber as minimal. The last visit occurred in December of 1992 and was of relatively short duration. No support payments were made. The report reiterated the Division's position that it did not intend to place Amber in Michele's home due to the latter's psychosis. Joseph continued to be monitored weekly by a public health nurse with periodic visits from Child Protective Services.

## THE SEVENTH REPORT

This report, filed September 23, 1993, stated that on March 11, 1993, Joseph was removed from Michele's home by the Child Protective Services for two weeks on charges of "physical neglect, emotional instability and a filthy home environment." The home was confirmed to be "filthy and unkempt," but the other charges were found to be unsubstantiated.[6] The Division later discovered that Michele had not refilled her medication for a while and that her behavior had deteriorated. The report also revealed that there were reports of domestic violence between Michele and William, and that there had been concern and reports made regarding Joseph's safety and health during the previous year. Most significantly, the report indicated that Michele had not requested any visits with Amber and had not paid any support. Amber reportedly had formed a strong bond with the Nelsons.

---

[5]Dr. Forbes also observed that Susan continued to have problems with alcoholism, but facts concerning this problem, which included hospitalization and the joining of Alcoholics Anonymous, are not developed in this opinion as they were resolved and do not have a position of relevance in the disposition of this appeal.

[6]At trial, however, there was testimony concerning domestic violence in Michele and William's home. Michele, in an interview, claimed that William had thrown objects at her, that the day before he had thrown a plate at her and hit her in the shin, and that he threw a fork at her face, narrowly missing her eye. William testified that he had never thrown anything at Michele. Michele also testified that William tried to strangle her once.

## THE CASA REPORTS

In 1992, a year prior to the seventh Division report, the Juvenile Court had appointed a Court Appointed Special Advocate ("CASA") to advocate on behalf of Amber's permanency planning needs. The CASA, Connie Olgespy, filed a report on March 17, 1994, indicating that Michele had made no contact with Amber since the December 1992 visit. The report stated that during Olgespy's home visit with Michele on March 3, 1994, Michele's breath smelled of alcohol. Moreover, despite an obvious effort by Michele to "immaculatize the house," the floors were quite dirty and the couch on which the visit took place smelled faintly of vomit. During the visit, Michele became visibly upset when asked why she had not visited Amber. She gave various reasons, one being that the State would not let her because she owed support money. Michele reportedly often became "very angry and almost out of control." Significantly, when informed that she was entitled to visits with Amber, she stated "I don't want to see her, let them have her, the f........g State took her and that lying bitch, my baby sister took her." Moreover, Michele declared that she had Joseph because "they" took Amber away, stating "I showed them." She also said, and then denied, that she "just might overdose on my medication and show everyone."[7]

The CASA's report stated that Amber had totally bonded with the Nelsons and with their nine-year-old daughter, Annie, calling the Nelsons "Mommy" and "Daddy," and referring to Annie as her sister.

In a CASA report filed September 21, 1994, the CASA described a supervised visit between Michele and Amber at Michele's home on August 31, 1994. Michele had had no contact with Amber prior to this visit since December 1992. At this time Amber was almost five years old. During the visit, Michele became extremely agitated with Susan, prompting Susan to leave.

---

[7]Also during this visit, Michele described some visual hallucinations she had experienced. She said that a green lizard had come out of a mole under her left eye, explaining, "I heard this crackling noise and there was a green lizard poking his head out of my face." She also said she had made medical history when a "three inch baby with black hair and fins started coming out." She stated that the doctor asked her if she wanted him to pull it out, and she answered yes, "but my f........g doctor pushed it back inside me." She described one time when she felt a severe burning from her throat down to her pelvis, vomited, and then saw an Indian woman. Finally, she reported that the day before the visit she had been going to the bathroom, and a head started to come out through her vagina, but she pushed it back in and crossed her legs. When asked if she had taken her medication that day, Michele responded that she had, but stated "the pills are just like aspirin, they don't do anything."

Although Susan's absence had a calming effect on Michele, the mother had to be encouraged several times to sit next to Amber. Reportedly, Amber, who was usually an "animated, happy, and somewhat verbal child," was very "quiet and withdrawn," and hid behind a coloring book for ten minutes. The only time Amber spoke was when Susan returned, saying, "it's my Mom." Once in the car with Susan and the CASA, Amber became talkative and happy.[8] The report stated that the following day, Amber was very "clingy" and seemed somewhat confused, going from Susan, to David, and to Annie saying, "Mommy, Daddy, sister," and hugging each of them over and over again. Amber did not want to discuss the visit with Michele. The report described other incidents indicating Amber's aversion to visiting Michele and Joseph. Finally, the CASA reported that it would be in Amber's best interest for the Nelsons to adopt her, as they wanted to do, "as it would continue to give Amber the stable and loving environment which she has come to depend upon."

## WILLIAM DUPREE

Appellant William Dupree, who has lived with Michele since before Amber's birth, claims to be Amber's father. His name was never placed on the child's birth certificate and when Amber was born, he made no effort to come forward or establish his relationship with Amber. Michele originally had expressed uncertainty as to the identity of the father, naming William and another man as possible candidates. In 1990, William spoke with the social worker, questioned whether he was the father, and inquired as to how he could establish paternity. The social worker directed William to the Clark County Health Department for DNA testing, but William never pursued the matter and never again contacted the social worker.

Although the first three case reports listed William Dupree as Amber's father, all reports after March 1992 were corrected to list him as the putative father. In William's only affirmative step to establish paternity, he completed an affidavit of paternity. The affidavit was signed February 21, 1995, five months after he was served with the petition for the termination of parental rights.

The district court considered William's testimony that he went with Michele to visit Amber four or five times in five years as lacking in credibility. The social worker testified that William made approximately three visits, but had experienced close contact with Amber only on one occasion. The other times he waited in the car while Michele visited. The social worker also testified

---

[8]Because of the extreme anger Michele exhibited towards Susan during the visit, on September 29, 1994, the Juvenile Court ordered that all visits between Michele and Amber be discontinued.

that William showed virtually no interest in Amber, had paid no support and given her no gifts. William explained at trial that he had failed to meet his parental obligations because Amber was living with Michele's relatives and that he felt "a little out of place."[9]

On March 1 and April 14, 1995, the district court conducted the trial and received evidence and heard testimony from all interested persons, including the CASA, the social caseworker, and the recently-appointed mental health caseworker. The court found that there was no known legally presumed father for Amber, and that William and any other man claiming that status had abandoned her. The court also found that Michele had failed to make necessary parental adjustments. The district court also determined that it was in Amber's best interest to terminate the parental rights of Michele and William and to place Amber with Susan and David Nelson. This appeal followed.

## DISCUSSION

Michele contends that her procedural due process rights were violated because she was never given the opportunity to care for Amber, and thus there was no evidence of neglect on her part. In support, Michele cites Lassiter v. Department of Social Services, 452 U.S. 18 (1981), and Mathews v. Eldridge, 424 U.S. 319 (1985).

The issue before the Supreme Court in *Lassiter* was whether counsel was required to represent parents in termination proceedings. The *Lassiter* court cites to *Mathews* in asserting that three elements must be balanced against each other in deciding the requirements of due process.[10] *Lassiter,* 452 U.S. at 27. Those three elements are "the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions." *Id.*

Here, Michele was afforded notice and provided counsel at the initial proceeding shortly after Amber's birth. At this proceeding, Michele acknowledged that she was unable to care for Amber because of her mental condition. Pursuant to the district court's order removing Amber from Michele's custody, Michele was presented with a reunification plan. Updated reports were submitted to the court every six months to allow for adjustments. After

---

[9]William was diagnosed as having cirrhosis of the liver and was told that the only way he could live was to stop drinking. However, he admitted at trial to having had a beer a week earlier.

[10]*Mathews* involved termination of social security disability payments, not termination of parental rights.

five years, during which Michele had demonstrated an unwilling-ness to comply with the plan through her meager visits with Amber and by paying only nominal support, the State brought an action to terminate Michele's parental rights. Michele was given notice of the hearing and was represented by counsel.

Although Michele insisted that there was no evidence of her neglect, and it is true that Amber never had been in Michele's care, the district court did not terminate Michele's parental rights because of neglect. The court's decision was based upon Michele's failure to make necessary parental adjustments. Thus, evidence of neglect was not a necessary predicate to termination.

Throughout the entire reunification program, continual efforts were made by the State to reduce the risk that the procedures used would lead to erroneous results, and that the requirements of due process were met with respect to Michele.

William maintains that his procedural due process rights were violated by the Division's failure to enter into a case plan for his reunification with Amber. He contends that the Division inten-tionally kept him "in the dark" regarding his responsibilities to the court in order to ensure that Michele never regained custody. However, William never did clearly acknowledge his paternity. He approached the Division on one occasion, but his concern at that time was whether he was even the father and how he could confirm paternity. William was told how to establish paternity, but never took the steps necessary to do so, nor did he contact the Division again.

William cites no authority for the proposition that the State is required to provide a case plan in such a situation. However, NRS 128.107 states, in relevant part,

> If a child is not in the physical custody of the parent or parents, the court, in determining whether parental rights should be terminated, shall consider, without limitation:
> 1. The services provided or offered to the parent or parents to facilitate a reunion with the child.

We conclude that the Division fulfilled its statutory obligation when it informed William of DNA testing and referred him to the Clark County Health Department. William's failure to otherwise establish his paternity, or show any meaningful or substantial interest in Amber was a greater cause for the lack of a reunifica-tion plan than any conduct by the Division. Moreover, William, as a known putative father, was provided notice and counsel for the termination proceedings.

The State provided William with due process by informing him of a means by which he could establish paternity and by appoint-

ing counsel at the termination hearing. Without further contact from William, and with virtually no demonstrated interest in Amber, the State was under no obligation to provide William with a case plan.

## JURISDICTIONAL AND DISPOSITIONAL GROUNDS

This court has recognized that the termination of parental rights is "an exercise of awesome power." Smith v. Smith, 102 Nev. 263, 266, 720 P.2d 1219, 1220 (1986). Termination of parental rights is "tantamount to imposition of a civil death penalty." Drury v. Lang, 105 Nev. 430, 433, 776 P.2d 843, 845 (1989). Before a parent's rights can be terminated, both jurisdictional and dispositional grounds must be proven by clear and convincing evidence. Smith at 266, 720 P.2d at 1221. Jurisdictional grounds relate to a specific fault or condition of the parents, while dispositional grounds relate to the best interests of the child. Id.

### 1. Jurisdictional Grounds

NRS 128.105 sets forth the statutory grounds for termination of parental rights.[11] The district court terminated Michele's parental rights because of failure of parental adjustment, stating:

> MICHELE JEAN DECK has been unable or unwilling within a reasonable time to correct substantially the circumstances, conduct or condition which led to the placement of

---

[11]NRS 128.105 (amended 1995) provides:

An order of the court for termination of parental rights must be made in light of the considerations set forth in this section and NRS 128.106, 128.107, and 128.108, with the initial and primary consideration being whether the best interests of the child would be served by the termination, but requiring a finding that the conduct of the parent or parents demonstrated at least one of the following:
1. Abandonment of the child;
2. Neglect of the child;
3. Unfitness of the parent;
4. Failure of parental adjustment;
5. Risk of serious physical, mental or emotional injury to the child if he were returned to, or remains in, the home of his parent or parents;
6. Only token efforts by the parent or parents:
(a) To support or communicate with the child;
(b) To prevent neglect of the child;
(c) To avoid being an unfit parent;
(d) To eliminate the risk of serious physical, mental or emotional injury to the child; or
7. With respect to termination of the parental rights of one parent, the abandonment by that parent.

her child outside of her home, notwithstanding reasonable efforts made by the state or a private person or agency to return the child home. The inability of the mother to complete her case plan is not based solely on her mental condition. The mother has failed to keep in contact with CHRISTY AMBER DECK. The mother instead appears to have focused her abilities toward caring for her son Joseph and has failed to maintain a relationship with her daughter. The Court finds that the relations between MICHELE JEAN DECK and her sister Sue Nelson did not prevent visitation. The mother has not provided any support for CHRISTY AMBER DECK and has not been consistent in her contact with the Division regarding her mental health treatment.

The language in the first sentence of the above quote tracks the statutory definition of "failure of parental adjustment" found in NRS 128.0126.[12]

Michele contends that she met every condition that was written into her case plan. However, the evidence demonstrates to the contrary.[13]

Michele also maintains that, while there is no cure for her disease, she is willing to correct the problem and has taken the medication since Amber was taken away. The evidence refutes Michele's assertion. Because Michele's medication is self-administered, it is difficult to verify whether or not she faithfully takes it.[14] However, the evidence clearly showed that on at least one occasion, Michele had failed to renew her prescription and did not take the medicine for a time, which resulted in her son, Joseph, being removed from the home for two weeks. Further, Michele testified at trial that she believes that when she stops taking the medicine, it does not affect her. Yet, the evidence at

---

[12]NRS 128.0126 provides:

"Failure of parental adjustment" occurs when a parent or parents are unable or unwilling within a reasonable time to correct substantially the circumstances, conduct or conditions which led to the placement of their child outside of their home, notwithstanding reasonable and appropriate efforts made by the state or a private person or agency to return the child to his home.

[13]The reunification plan required Michele to: (1) receive counseling through Las Vegas Mental Health; (2) take prescribed medication; (3) pay child support in the amount of $10 per month; (4) maintain monthly contact with her social worker; and (5) maintain monthly supervised visits with Amber.

[14]Christy Munun, Michele's mental health case manager from September 1994 until trial, testified that Michele had been consistent in taking her medication. However, she explained that her determination as to whether Michele was taking medication was simply based on whether Michele showed up at the clinic.

trial clearly indicated that when she fails to take the medicine, her condition deteriorates. Michele's attitude reflects an unwillingness or inability to recognize the nature of her illness and the importance of faithfully taking the medicine in order to manage her condition.

Importantly, however, the district court indicated in its findings that Michele's inability to complete her case plan was not based solely on her mental condition. The district court also found that Michele had only made token efforts to visit Amber or provide any financial support. The plan required Michele to pay a nominal amount of child support. Michele failed to meet this condition. Michele maintains that a guardian at the Public Administrator's office had control over her funds, and therefore she should not be held responsible for any failure to provide the $10 monthly support payment. However, Michele failed to explain why she did not approach her guardian and request that the support payments be made, nor does Michele explain how a $120 support payment was made in late 1991. Michele reasonably could have advised her guardian to make the payments, but failed to do so.

Michele further argues that she "utilize[d] every opportunity granted to her by the Nevada State Welfare Division to visit her daughter." However, the evidence clearly showed that the Division did not prohibit contact between Michele and Amber. To the contrary, the Division initially allowed Michele supervised visits with Amber once a month, and after 1991, as frequently as Michele pleased. Michele's failure to visit Amber consistently was a concern to the Division, expressed in almost every case report. As the trial court noted, Michele's relationship with her sister Susan, with whom Amber stayed, was not so terrible that Michele could not have maintained contact with Amber. Michele was free to arrange visitation through a caseworker, and thus avoid contact with Susan.

Michele's permanent mental condition, her belief that the medication has no effect on her, her token efforts to visit and develop a relationship with Amber over the years, and her failure to provide support, all provide clear and convincing evidence of Michele's failure to make the necessary parental adjustments. Therefore, the district court had jurisdictional grounds to terminate Michele's parental rights.

William contends that the district court erred in finding that he abandoned Amber. NRS 128.012 defines abandonment of a child as "any conduct of one or both parents of a child which evinces a settled purpose on the part of one or both parents to forego all parental custody and relinquish all claims to the child." The

statute states that the intent to abandon is presumed when the parent leaves the child in the care of another without provision for support and without communication for six months. This court stated in Sernaker v. Ehrlich, 86 Nev. 277, 280, 468 P.2d 5, 7 (1970):

> Abandonment is conduct. The typical kinds of conduct which constitute abandonment are the withholding of parental presence, love, care, filial affection and support and maintenance. The conduct must be intentional and must show a settled purpose to relinquish all parental rights in the child. Nonsupport is not synonymous with abandonment but it is a factor in determining whether a parent has abandoned his child. Lack of support plus other conduct such as a failure to communicate by letter or telephone, or absence of sending gifts is sufficient to uphold the trial court's conclusion that the child has been abandoned.

(Citations omitted.)

William contends that he had a continuous relationship with Michele and maintained stable housing throughout Amber's life, that he went to court appearances with Michele and was never asked to participate in the court proceedings. However, these facts do little to overcome his lack of involvement in Amber's life. The evidence clearly established that at the outset, it was unclear who Amber's father was, and that William and Michele both questioned paternity. William made no effort to establish himself as the natural father, even though he had information regarding where to go for testing. An affidavit of paternity was signed only after the commencement of litigation to terminate William's parental rights. William provided no support, gave no gifts, and had little or no significant contact with Amber in her five-and-one-half years of life. Such lack of involvement afforded clear and convincing evidence of abandonment and provided the district court with jurisdictional grounds to terminate William's parental rights.

## 2. *Dispositional Grounds*

Dispositional grounds exist "[i]f under no reasonable circumstances the child's best interest can be served by sustaining the parental tie." Champagne v. Welfare Division, 100 Nev. 640, 652, 691 P.2d 849, 858 (1984). In *Champagne,* this court stated that in determining dispositional grounds, the court may consider

> "whether additional services would be likely to bring about a lasting parental adjustment . . . within a predictable period of time," NRS 128.107(4); it may consider the physical,

mental, or emotional conditions and needs of the child, including the child's desires, NRS 128.107(2); or it may conclude that the natural parents are so depraved or so disinterested that it appears that even having no parents is better than having this kind of parent. The overlying dispositional issue is that of the welfare of the child.

*Id.* at 652-653, 691 P.2d at 858.

In the present case, Amber has lived with Susan and David Nelson her entire life and is flourishing in their household. She considers them her parents and is treated as a daughter. Amber has had so little contact with Michele and William that she considers them strangers.

Michele points to Ms. Munun's testimony, wherein Ms. Munun stated that Michele appeared to adequately take care of her other child, Joseph. However, Ms. Munun also admitted that her expertise did not include Michele's ability to care for Amber. On the other hand, Dr. Forbes concluded that Michele's mental condition prevented her from providing for a child on a long-term basis.

The district court found the CASA's testimony very credible in concluding that the best interest of Amber would be served by placement with Susan and David Nelson. Michele contends that the CASA's testimony was biased because between March and September of 1994, the CASA had no contact with Michele or William, but had eighteen contacts with the Nelsons. Michele further points out that the CASA's testimony is based on only one interview with Michele and one visit with Michele and Amber. However, the CASA explained that she made more contacts with the Nelsons because ''that's where Amber is and I need—I need to make sure that everything is being maintained as it should be.''

The CASA testified that in all her visits with the Nelsons, she had always observed Susan sober and had never detected alcohol abuse. She testified that the Nelsons are loving and responsive to Amber.

We conclude that there are no reasonable circumstances where Amber's best interests can be served by sustaining a parental tie to Michele and William for the following reasons: (1) psychiatric evaluations have concluded that Michele is not able to care for Amber on a long-term basis; (2) long periods of separation without any visits from Michele or William have estranged Amber from her natural parents, and any reunion would likely prove unduly traumatic to Amber; (3) Amber has integrated and bonded with the Nelsons and enjoys a loving and nurturing environment in their home; and (4) the Nelsons are the only family Amber has ever known.

## CONCLUSION

For the reasons discussed above, we conclude that the district court did not err in terminating the parental rights of Michele and William and ordering the placement of Amber with Susan and David Nelson. We therefore affirm the judgment entered by the district court.

YOUNG, SHEARING, and ROSE, JJ., concur.

SPRINGER, J., dissenting:

This case is similar to Bush v. State, Dep't Hum. Res., 112 Nev. 1298, 929 P.2d 940 (1996), in which I dissented because I objected to this court's affirming the termination of parental rights of parents because they were mentally handicapped. In the *Bush* case, the parents whose parental rights were terminated were mentally deficient, having IQs in the 60s. In the present case, the child's mother, Michele Deck, is disabled by chronic paranoid schizophrenia that manifests itself in the form of intermittent auditory and visual hallucinations. The State claims that this mother's mental disability renders her incapable of continuing to be the mother of her daughter, Amber. The difference between this case and the *Bush* case is the difference between the handicap of mental deficiency and the handicap of mental disorder.

I dissent with respect to the termination of parental rights of the mother, Michele Deck, only. Ms. Deck suffers from paranoid schizophrenia, a chronic mental disorder that is treatable chemically. Although the trial court ruled that the "inability of the mother to complete her case plan is not based *solely* on her mental condition," it is quite apparent that this mother's schizophrenia was the main reason (as was mental deficiency in the *Bush* case) for (as put by the majority) "Michele's failure to make necessary parental adjustments."

As pointed out by the majority, although Ms. Deck has suffered from "periodic auditory and visual hallucinations and violent mood shifts," she does have extended periods of remission and, at present, has custody of her other, younger child, Joseph, born December 25, 1991. The "terminated" child, Amber, has been living with her aunt and uncle and apparently is doing well in their home; and, I am not saying, of course, that Amber should be snatched out of her present environment and placed now, full-time, in her mother's custody. All I am saying is that it is not *necessary* under the circumstances of this case to sever permanently the parental relationship of this child with her mother. "[A] parent does not *deserve* to forfeit the sacred liberty right of parenthood unless such unfitness is shown to be severe and

persistent and such as to render the parent *unsuitable* to maintain the parental relationship." Champagne v. Welfare Division, 100 Nev. 640, 648, 691 P.2d 849, 855 (1984) (emphasis added). Ms. Deck does not "deserve" to have her daughter taken permanently away from her; and, although Ms. Deck may be sick, she is raising her son Joseph in her home, and it appears to me that her treatable mental illness has not created the "irremediable inability to function" as a parent that was referred to in *Champagne.*" *Id.* at 648 n.5, 691 P.2d at 855.

I complained in *Bush* about this courts failing to deal with the principles that should be applied to handicapped parents who have difficulties in raising their children. I complain again here. As the law now stands, welfare officials do not have to be concerned about faultless disabilities and handicaps. I would like to see the court define what circumstances, if any, would justify permanent severance of the parental ties of mentally deficient, mentally disordered, or, for that matter, physically disabled parents. It continues to refuse to do so. The attitude of welfare officials and this court appears to me to be: "We'll try to help you for a while, but after that if your handicap prevents you from conforming to our 'case plan,' we are going to take your children away permanently." This is not right.

As recognized by the majority, dispositional grounds for permanently severing the parental relationship are present only when under no reasonable circumstances the child's best interest can be served by sustaining the parental tie. There are many ways in which the child's interest can be served in this case without taking her mother away from her. Apparently, she has been living with her aunt and uncle for some time and will continue to live with them in the same fashion whether her mother is permanently taken away from her or not. About the only, remote circumstance that I can see that could possibly justify a termination in this case would be if the aunt and uncle were to take the unreasonable position that they would not continue to serve as foster parents unless the State effected a termination of the natural mother's parental rights. Even under such a hypothetical circumstance, I would still have to be convinced that there were no reasonable circumstances under which the child could keep her mother.

As I have indicated in my dissents to other termination cases, the State seems to be running amok, spouting pop psychology and terminating parental rights in cases where it is clearly not necessary to do, particularly in cases of poor and otherwise handicapped parents. *See Bush, supra;* In the Matter of Parental Rights as to Bow, 113 Nev. 141, 930 P.2d 1128 (1997).