*727
 
 OPINION
 

 Per Curiam:
 

 This case involves the termination of parental rights of Francisco M., who is incarcerated for the kidnapping of his wife. He contends that his rights were terminated solely based on his incarceration and that the Division of Child and Family Services failed to prove parental fault.
 

 FACTS
 

 E.G.P. was born on May 25, 1995, to Angela and Jose A. However, appellant Francisco M. testified that he was E.G.P.’s acting father. Angela and Francisco also had two children together. C.J.M. was born on June 9, 1997, and J.F.M. was born on May 12, 1999. On five separate occasions, Francisco was arrested for domestic battery upon Angela.
 
 [1]
 
 Angela reported that Francisco also beat the children, especially E.G.P.
 

 Francisco’s most recent arrest occurred on December 31, 1999, for obstructing a police officer, battery/domestic violence, and first-degree kidnapping for the abduction of his wife from a house where drug use was rampant. Francisco was allowed to plead guilty to second-degree kidnapping and was convicted on February 28, 2001. He was sentenced to two to five years’ incarceration. An investigation revealed that at the time of his arrest, he admitted to the arresting officer that he ingested two lines of cocaine that evening. In his opening brief on appeal, Francisco states that Angela’s “attitude” in abandoning her children was what “caused [Francisco] to act inappropriately by ‘kidnap[p]ing’ and bringing her back to take care of the children.’ ’
 

 C.J.M. and J.F.M., the two younger children, lived with their paternal aunt and uncle following Francisco’s arrest. The aunt and uncle refused to take custody of E.G.P. On January 3, 2000, Angela voluntarily left E.G.P. in the custody of the Division of Child and Family Services (“DCFS”). Angela admitted that she was not able to care for E.G.P. due to her drug use. Further, Angela admitted that she lived with people who used cocaine, and she did not want E.G.P. to live in such an environment. The aunt and uncle eventually chose to transfer custody of the two younger children to DCFS on February 14, 2000, because they could not care for them.
 

 A petition for abuse/neglect was filed with the juvenile division of the district court on January 19, 2000, against Angela and Francisco. Francisco contested the petition, but the court found
 
 *728
 
 that Angela’s drug use and Francisco’s domestic violence adversely affected their ability to parent the children.
 

 As a result of the family court’s recommendation, the district court conducted a report and dispositional hearing on March 8, 2000. All three children were in the custody of DCFS. The Child Protective Services (“CPS”) specialist report indicated that Francisco admitted to cocaine usage and that he needed drug treatment as well as counseling to address domestic violence and self-esteem issues. Francisco attended the hearing and was introduced to Ingrid Ponce, the DCFS social worker. Francisco informed Ponce that he did not want to lose his children, but knew he would be “going away.” Ponce testified that Francisco’s plan was for Angela to work on a program to regain custody of the children. Ponce described her role in the case and provided Francisco with her name and telephone number. Ponce contacted the prison where Francisco was incarcerated a few months later to let the prison social worker know how to contact her and also to ascertain whether Francisco had made any progress regarding his drug treatment and counseling. At that time, Francisco had not completed any programs in prison to address his domestic violence, drug use, and self-esteem issues.
 

 On April 5, 2000, DCFS developed a case plan with Angela. The case plan was based on recommendations in the Children’s Resource Bureau Report, which provided an independent psychosocial assessment of the family. However, due to his incarceration, Francisco could not be interviewed for that assessment. The report contained no recommendations to reunite the children with Francisco.
 

 On October 24, 2000, a foster care review hearing was conducted in the family division of the district court. Angela had not complied with her case plan, and Francisco had made no contact with DCFS or the children. The permanency plan was to terminate Francisco’s parental rights, to find paternal relative placement for C.J.M. and J.F.M., and to reunify E.G.P. with Angela. A concurrent plan for termination of parental rights and adoption of all three children was being considered. At this hearing, the court found that continuation of reasonable efforts to reunify the entire family was inconsistent with the permanent placement plan and that DCFS was not required to make reasonable efforts to reunify the family as mandated by NRS 432B.393(1).
 
 [2]
 
 The court adopted the initial permanency plan presented by DCFS that placed C.J.M. and J.F.M. with paternal relatives and reunified
 
 *729
 
 E.G.P. with Angela on October 24, 2000.
 
 [3]
 
 Ponce then referred the matter by filing a termination petition the last week of December 2000.
 

 On January 23, 2001, a juvenile review was conducted in family court. The court affirmed its finding that DCFS was not required to make reasonable efforts to reunite the family. The permanency plan and concurrent termination plan remained the same.
 

 On January 30, 2001, Angela relinquished her parental rights to all of the children. The petition to terminate Francisco’s parental rights was filed on March 5, 2001. The petition alleged the parental fault of abandonment and unfitness against both Francisco and the biological father of E.G.P. Francisco was personally served with notice of the petition on March 23, 2001. Francisco then contacted DCFS regarding the termination of his parental rights despite his failure to demonstrate any effort to contact the children or DCFS since the dispositional hearing on March 8, 2000.
 

 Both Ponce and Penny Kelly, another DCFS social worker, testified that Francisco had been instructed to contact DCFS upon completion of any courses such as parenting, anger management, and drug/alcohol assessments,
 
 [4]
 
 but that there had been no such contact before the proceedings to terminate his parental rights. However, once Francisco was notified of the proceedings to terminate his parental rights, he sent DCFS documentation showing that he had been assessed for various classes, attended sixteen AA classes, and had begun an anger management program. Kelly testified that she found documentation that Francisco had been assessed, but she found nothing in Francisco’s file that showed actual completion of any of the courses.
 

 The most recent juvenile court review, prior to the termination of parental rights hearing, was conducted in family court on April 24, 2001. At that time, the children had been in DCFS’s custody for a month because of problems in the previous foster home. Nevertheless, DCFS informed the court that a potential adoptive home had been identified for all three children.
 

 A hearing on this matter was conducted on June 28, 2001, before Judge Gerald W. Hardcastle in the Family Court Division of the Eighth Judicial District Court. DCFS contended that
 
 *730
 
 Francisco’s parental fault consisted of abandonment and unfitness. DCFS argued that Francisco provided neither a residence nor an income for the children. Further, DCFS claimed that the consequences of Francisco’s actions are not only his incarceration, but also his inability to provide the nurturing and support that the children need. Prior to being placed in protective custody, Francisco had been arrested five times for domestic battery against Angela and an officer affidavit filed by Family Youth Services reported that Francisco had physically harmed the children as well. Also, DCFS alleged that Francisco had not shown that he could maintain sobriety, provide a stable home, or remain free from criminal activity upon release from prison. In addition, Francisco had not maintained a relationship with the children or kept in contact with DCFS during his incarceration.
 

 DCFS offered evidence at trial that the children have needs that will require exceptional parenting skills. Kelly testified that E.G.P. and C.J.M., upon being assessed, showed that they had learned to solve problems with violence and that all of the children would need intensive care for several years. In addition, evidence was presented that the children have an extremely close bond to each other and separation would be detrimental. The children had been temporarily placed at the potential adoptive home. The mother in that home testified regarding the bond between her family and the children, and also regarding the plans she and her husband had to care for the children as adoptive parents.
 

 Ponce testified that her duties included recommending whether a termination proceeding is advised based on the parent’s progress and reunification. When asked if she could make a recommendation regarding Francisco, Ponce testified that she could not, because she was not familiar with Francisco or his behavior around the children. Kelly testified that her job was to try to act in the children’s best interests, but she never attempted to contact Francisco or E.G.P.’s biological father. Rebecca Foster, the Court Appointed Special Advocate, also testified that she had never attempted to contact Francisco and had not seen any interaction between him and the children.
 

 Francisco testified that he had financially provided for the children when the family lived together. Francisco claimed that he did not know where the children were but only knew that they were in a foster home. He confirmed that he expressed his desire not to lose his parental rights and testified that Ponce sent him photographs of the children upon his request. Also, he testified that he had attended anger management classes, as requested by Ponce, attended math and reading classes, and obtained employment while in prison. Francisco further testified that Ponce had not contacted him from the date of the initial hearing in March 2000 until he was notified of the proceedings to terminate his
 
 *731
 
 parental rights. He testified that he expected to be released on December 30, 2001, and that he had employment arranged with his brother-in-law as a landscaper. However, Francisco also testified that he could not be certain of being released on that date. According to Francisco, before being sent to prison, he had physical custody of the children, and Angela was not living at home with them.
 

 At the end of the hearing, the court inquired as to whether DCFS was prepared to argue that incarceration for five years should result in the termination of parental rights. DCFS denied that incarceration alone should mandate that Francisco’s parental rights be terminated. However, the court pressed on, asking why DCFS was afraid to say that incarceration for two to five years constitutes grounds for termination. The court then stated:
 

 Because, frankly, he’s done everything he can do. He can’t do any more. Now, the fact that he has not contacted his children, fine. I am not certain that it constitutes abandonment because that’s not what he intended to do. He’s . . . he’s stuck in a very artificial situation.
 

 The court stated that Ponce’s failure to provide Francisco with a case plan was “marginally justifiable” and that she probably still should have provided him with a plan. The court then stated:
 

 [T]he reality is, there [are] some fathers we stick with and some we don’t. When it is arbitrary, we don’t know what the standard is. Then it becomes very difficult when [you are] a judge sitting here to try to make a decision to terminate somebody’s rights when you don’t know what the standard is.
 

 However, the court took the matter under advisement, and upon reviewing the juvenile file, which was not reviewed prior to trial but was placed into evidence during trial without objection, the court found parental fault on the part of Francisco based on abandonment and unfitness by clear and convincing evidence.
 

 In its decision, the court stated that from December 31, 1999, until Francisco was advised of the effort to terminate his parental rights in January 2001, he provided no support for the children and did not communicate with them. The court further stated:
 

 While there are many types of contact and communication a person in prison cannot obviously exercise, there is much that can be done. Letters can be written and gifts can be sent. Imprisonment does not result in total loss of contact between parents and children. Here, not only was there no contact of any kind, there was
 
 no effort
 
 to contact the children. Further, it is difficult to understand why [Angela’s] efforts have any
 
 *732
 
 relationship to [Francisco’s] parental obligation to maintain a relationship with his children.
 

 The court found that much of Francisco’s efforts in prison were directed at his desire for parole, and that abandonment was proved. The court’s finding of unfitness was based in part on Francisco’s imprisonment for a violent felony conviction, but also on ‘ ‘his disregarding attitude toward the children while in prison.’ ’ Additionally, the court noted that Francisco had provided no indication that he had a significant relationship with the children before his incarceration. “The issue presented is whether [the court] can reasonably see [Francisco] raising these children. The answer is obvious.”
 

 The court found that the children’s best interests would be served by terminating Francisco’s parental rights because there were committed foster parents available to adopt all of the children. Otherwise, E.G.P. might be separated from the other siblings because Francisco is not E.G.P.’s natural father.
 

 DISCUSSION
 

 “[T]his court closely scrutinizes whether the district court properly preserved or terminated the parental rights at issue.”
 
 [5]
 
 Before parental rights are terminated, due process requires clear and convincing evidence supporting such a decision.
 
 [6]
 
 On appeal, we will not reverse a court’s decision to terminate parental rights provided there is substantial evidence supporting the termination order.
 
 [7]
 

 Furthermore, we have acknowledged “the seriousness and . . . terrible finality of a decree terminating parental rights. Undoubtedly such remedy should be applied with caution.”
 
 [8]
 
 However, we will not attempt to substitute our judgment for that of the trial court in an area of heightened sensitivity, since the trial court was in a position to observe the demeanor of the parties and weigh their credibility.
 
 [9]
 

 NRS 128.105 provides that “[t]he primary consideration in any proceeding to terminate parental rights must be whether the best interests of the child will be served by the termination.”
 
 [10]
 
 
 *733
 
 Francisco claims that DCFS presented no evidence as to the issue of the children’s best interests in this case. We disagree and conclude that the record evinces substantial evidence in support of the district court’s conclusion that the children’s best interests are served by termination.
 

 The evidence introduced in this case showed that Francisco had no significant relationship with the children. In fact, it was Francisco who presented no countervailing evidence on the issue. The Court Appointed Special Advocate testified that the children rarely mentioned their father, and only recalled a fight between their parents and that their father was now with the police. In addition, Francisco is the father of only two of the three children involved in these proceedings, creating the possibility that the children might be separated. There was evidence at trial that the children have become dependent upon each other. In determining whether termination of Francisco’s parental rights was in the children’s best interests, the district court properly considered the possibility that the children might be separated if Francisco retained his parental rights.
 

 Moreover, NRS 128.108 provides that if children in the custody of a public agency reside in a foster home and proceedings have been instituted with the goal of adoption by the foster parent, the district court shall consider whether the children have become fully integrated into the family. Here, the children have been integrated into a foster home where the parents are willing and able to permanently treat all three children as members of their own family. Termination of Francisco’s parental rights would allow the three children to remain together and live in a home where they have become integrated into the family. Therefore, substantial evidence in the record supports the district court’s conclusion that the children’s best interests will be served by the termination of Francisco’s parental rights.
 

 Although the primary consideration in the decision to terminate parental rights is the best interests of the child, “the district court must [also] find at least one of the enumerated factors for parental fault.”
 
 [11]
 
 Among the factors enumerated in NRS 128.105(2) are abandonment of the child and unfitness of the parent.
 

 A child is considered abandoned when a parent “evinces a settled purpose ... to forego all parental custody and relinquish all claims to the child.”
 
 [12]
 
 A parent is presumed to have abandoned a
 
 *734
 
 child if that parent provides no support or communication with the child for six months.
 
 [13]
 
 Here, from the time Francisco was arrested on December 31, 1999, until he was notified of the effort to terminate his parental rights in March 2001, Francisco made no effort to contact his children.
 
 [14]
 
 Francisco relied completely on his wife, whom he was aware had a drug addiction problem, to care for the children without contacting her to inquire about the children’s well being.
 

 Francisco failed to notify DCFS that he had completed any training or counseling that would address his history of domestic violence. However, upon being notified of the proceedings to terminate his parental rights, Francisco expressed interest in retaining those rights. Upon request, Francisco provided documentation that he had completed some domestic violence course work in prison, and had been assessed for other courses. Francisco now claims that he has done everything that was asked of him, and that DCFS failed to provide him with a case plan in order to retain his parental rights. He also claims that DCFS failed to inform him that he could contact his children and did not provide him with the children’s contact information.
 

 If evidence is introduced at trial that a parent has failed to support or contact his children for six months, the burden of proof shifts to the parent to prove that he did not abandon his children.
 
 [15]
 
 While Francisco made some effort toward retaining his parental rights after being notified of the termination proceedings, he did not overcome the presumption that he abandoned his children. A parent’s opposition to termination of his parental rights may indicate that he has not evinced the intent to abandon his children.
 
 [16]
 
 “However, the trial court is not obligated to accord greater weight to the parent’s belated protestations than to the parent’s failure to provide support and communicate with the child.”
 
 [17]
 
 Therefore, we conclude that the district court did not err in determining that Francisco had abandoned his children.
 

 Francisco also contends that termination of his parental rights was improper because he was not provided a case plan that would
 
 *735
 
 provide an opportunity for him to retain his parental rights. NRS 128.107(1) only provides that the court must consider the services provided “to facilitate a reunion with the children]” if the children are not in the physical custody of the parent.
 
 [18]
 

 This court previously considered whether DCFS was obligated to provide a reunification case plan in
 
 Matter of Parental Rights as to
 
 Deck.
 
 [19]
 
 There, we held that DCFS was not obligated to provide a case plan when the father had demonstrated little interest in the child.
 
 [20]
 
 Due process is served and DCFS’s statutory obligation fulfilled by informing the father of the procedures necessary to establish or retain parental rights.
 
 [21]
 
 Here, Francisco was notified of the proceedings to terminate parental rights and was advised of the procedures necessary to retain his rights.
 

 Francisco was aware that a case plan had been provided for his wife, and he relied on her to complete the provisions of the case plan in order to retain her parental rights. The district court stated that DCFS should have provided Francisco with a case plan, but its failure to do so was “marginally justifiable.” As the district court noted, “it is difficult to understand why [his wife’s] efforts have any relationship to [Francisco’s] parental obligation to maintain a relationship with his children.” Although Francisco had expressed interest in the children before his incarceration, we agree with the district court that his failure to show any meaningful or substantial interest in the children for over a year was a greater cause for the lack of a reunification plan than any conduct by DCFS, and so under
 
 Deck,
 
 DCFS was not obligated to provide a case plan.
 

 In addition, NRS 128.018 defines a parent as unfit if he, “by reason of his fault or habit or conduct toward the child or other persons, fails to provide such child with proper care, guidance and support.” NRS 128.106(6) provides for specific considerations in determining unfitness of a parent, including “[c]onviction of the parent for commission of a felony, if the facts of the crime are of such a nature as to indicate the unfitness of the parent.” In the present case, Francisco had been arrested for domestic battery upon his wife on five separate occasions. His wife reported that Francisco also beat the children, especially E.G.R Francisco was most recently arrested for obstructing a police officer,
 
 *736
 
 battery/domestic violence, and first-degree kidnapping, all against the children’s mother. Francisco also admitted to using cocaine at the time of the arrest. However, Francisco was allowed to plead guilty to second-degree kidnapping and was sentenced to two to five years’ incarceration. The court found the allegations of abuse and neglect to be proved, and the children were placed into the custody of DCFS.
 

 In its decision to terminate Francisco’s parental rights, the court acknowledged the failure to prove the underlying facts of his felony conviction since Francisco pleaded guilty. However, the court ultimately determined that the conviction, combined with Francisco’s indifferent attitude towards the children, proved Francisco was unfit. The court also noted the lack of a significant relationship with the children. We conclude that there is substantial evidence supporting the district court’s reliance on Francisco’s felony conviction and lack of interest in the children to establish unfitness.
 

 Francisco also claims that his parental rights were terminated because he was incarcerated. We disagree. Though this court recently held in
 
 Matter of Parental Rights as to Q.L.R,
 

 [22]
 

 that incarceration alone cannot justify termination of parental rights, we did not go so far as to suggest that incarceration should act as a bar to such terminations. Instead, incarceration should be considered along with other factors in determining parental fitness and in making a determination on what course of action would serve the children’s best interests. Here, the district court clearly articulated reasons over and above incarceration for terminating Francisco’s parental rights. Accordingly, we affirm the judgment of the district court.
 

 [1]
 

 Francisco claimed that Angela called the police for no reason on all of the prior occasions when he was arrested for domestic violence.
 

 [2]
 

 The district court relied on NRS 432B.393(3)(b), which provides that reasonable efforts to reunify are not required if the parent, during the previous six months, “had the ability to contact or communicate with the child and made no more than token efforts to do so.”
 

 [3]
 

 The record reveals that the plan was not actually filed until March 6, 2001.
 

 [4]
 

 Francisco found it important to note that “[n]one of [Ponce’s] suggestions included contacting his children.” Francisco also notes that DCFS never asked him to maintain contact with the children, nor advised him that he had “permission” to contact his own children. Francisco does not, however, provide any reason as to why he would have believed he was prohibited from contacting his children, or why he did not contact his children through a social worker without having to be told to do so.
 

 [5]
 

 Matter of Parental Rights as to N.J.,
 
 116 Nev. 790, 795, 8 P.3d 126, 129 (2000).
 

 [6]
 

 Id.
 

 [7]
 

 Id.
 

 [8]
 

 Carson
 
 v.
 
 Lowe, 76
 
 Nev. 446, 451, 357 P.2d 591, 594 (1960).
 

 [9]
 

 Id.
 
 at 451-52, 357 P.2d at 594.
 

 [10]
 

 See also Matter of N.J.,
 
 116 Nev. at 795, 8 P.3d at 129.
 

 [11]
 

 Id.
 
 at 801, 8 P.3d at 133.
 

 [12]
 

 NRS 128.012(1).
 

 [13]
 

 NRS 128.012(2).
 

 [14]
 

 Francisco testified that he attempted to call DCFS collect, but the operator did not answer. However, DCFS noted that it accepts collect phone calls, and the issue was dropped.
 

 [15]
 

 Matter of N.J.,
 
 116 Nev. at 803, 8 P.3d at 134.
 

 [16]
 

 Greeson
 
 v.
 
 Barnes,
 
 111 Nev. 1198, 1204, 900 P.2d 943, 947 (1995),
 
 superseded by statute as stated in Matter of N.J.,
 
 116 Nev. 790, 8 P.3d 126.
 

 [17]
 

 Id.
 

 [18]
 

 See Matter of Parental Rights as to Deck,
 
 113 Nev. 124, 133-34, 930 P.2d 760, 765-66 (1997).
 

 [19]
 

 Id.
 

 [20]
 

 Id.
 
 at 133-34, 930 P.2d at 766.
 

 [21]
 

 Id.
 

 [22]
 

 118 Nev. 602, 54 P.3d 56 (2002).